J-A12037-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                          : PENNSYLVANIA
                                          :
                   v.                     :
                                          :
                                          :
COLIN PATRICK GEARHART                    :
                                          :
              Appellant                   : No. 1555 WDA 2019


Appeal from the Judgment of Sentence Entered June 10, 2019,
in the Court of Common Pleas of Westmoreland County,
Criminal Division at No(s): CP-65-CR-0000957-2016.

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.: FILED SEPTEMBER 22, 2020

Colin Patrick Gearhart appeals from the judgment of sentence imposed following his conviction of third-degree murder and related offenses. We affirm.

Gearhart was involved in a scheme to rob an acquaintance which resulted in the death of Daniel McNerney (hereinafter "Victim"). Gearhart, who was seventeen years old at the time of the shooting, was arrested and charged with second-degree and third-degree murder, robbery and conspiracy.[1] Gearhart filed a pre-trial motion to suppress recorded statements he made to police during their initial investigation. Following a suppression

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] See 18 Pa.C.S.A. §§ 2502(b), (c); 301(a)(1)(i); 903(a)(1).

hearing, the trial court denied the motion. The matter proceeded to a jury trial. The trial court detailed the evidence presented at trial as follows:

Remington Johnson (hereinafter "Johnson") and Christopher Showers (hereinafter "Showers") planned to travel from Pennsylvania to Colorado for about one (1) week. On January 19, 2016, Johnson picked-up Showers in Wexford, Pennsylvania. Prior to leaving for Colorado, Showers directed Johnson to drive to two (2) locations so that he could obtain money from friends. They first travelled to a trailer park in New Derry, Pennsylvania, and Showers borrowed about $2,000 from a friend. Showers placed this money inside of a bag located in the trunk of the vehicle, which also contained about $10,000 to $12,000.

Showers and Johnson subsequently drove to [Gearhart's] residence located at 409 St. Clair Street in Latrobe, Pennsylvania. Showers intended to go to [Gearhart's] residence to retrieve money from [Gearhart] and sell cocaine to [Victim]. [Gearhart] called Showers multiple times that night to see if he was coming over. [Gearhart] told Showers to stop over, that he knew he was going to Colorado, and he had money for Showers. Showers and Johnson arrived at [Gearhart's] residence at around 11:00 p.m. and Johnson parked his vehicle on the street near the front of the house.

Showers and Johnson entered the residence and observed [Gearhart], Victim, and Austin Krinock (hereinafter "Krinock"). Showers wore a drawstring gym bag into the house and he generally brought a bag with him to carry money. Johnson testified that the individuals were having a "boys night" and drinking out of red Solo cups. Showers also testified that the individuals were "hanging out" and smoking and drinking. Showers received $300 from [Gearhart] and $80 from Victim and he placed this money inside of his pocket. Showers introduced Johnson to the individuals and discussed their trip to Colorado with them.

After about thirty (30) to forty-five (45) minutes, Showers and Johnson left the residence and walked back to Johnson's vehicle. Showers placed his drawstring back inside of the trunk, which also contained two (2) duffle bags. As they prepared to leave for Colorado, Johnson glanced over his right shoulder and saw a man dressed in dark clothing coming from the bushes on

- 2 -

the side of the house. Johnson testified that the man wore a dark colored face mask or bandana that extended from his neck or chin and beyond the bridge of his nose. The man (hereinafter "gunman") pulled out a small-framed black pistol from his waistband and a red dot coming from the weapon appeared in the middle of Johnson's chest. He fed a live round into the chamber of the gun and stated, "do you think it's a fucking game?" The gunman demanded money, drugs, and whatever they had on them. Johnson put his hands up and stated, "I don't know what you're talking about, we don't have anything" and he attempted to dissuade the gunman from robbing them. The gunman directed Johnson to get down on the ground. Johnson went to his knees and turned to face his car. The gunman held his pistol to the back of Johnson's head and demanded that he get all the way down on the ground. Johnson refused stating, "I'm not a dog." In response, the gunman pistol whipped Johnson in the back of his head.

The gunman subsequently walked around the front of Johnson's car to Showers and put him into a headlock. He held his pistol to the side of Showers' head and demanded money, drugs, and whatever he had on him. He also asked Showers if he "wanted to die tonight." Showers told the gunman that he left money inside of the house and he asked if he could retrieve it. The gunman agreed and they walked to the front of the residence while the gun was pointed at Showers. Showers testified that they momentarily fought for the gun, but the gunman ultimately retained control of it. Showers knocked on the door of the house and Krinock let him inside.

Johnson testified that the vehicle's trunk was still open so he got up and closed it. Upon hearing Johnson close the trunk, the gunman turned around, pointed the gun at Johnson, and told him to "back up." Johnson moved backward and stood on the sidewalk near the rear driver's side door of the vehicle. The gunman stated, "these are my streets, this is my turf, I've told these kids about selling drugs on my streets." Johnson replied, "this isn't the way we do things, man" and "you don't need to wave a gun around to get money, you don't need to threaten violence against other people for any reason." The gunman did not "want to hear it" and stated, "these are my streets, this is my streets, don't be selling drugs on my streets, where's your money, give me the money." Johnson testified that he held his hands up to show the gunman that he was not being hostile.

Showers testified that when he went inside the residence, he told the individuals what was happening and he asked them if they had any weapons and could help. [Gearhart] and Krinock stated that they did not have any weapons and did not know what Showers could do. Showers then went into the basement to "collect [his] thoughts." About five (5) to ten (10) minutes later, [Gearhart] went downstairs and told Showers, "yeah, this guy's not leaving, go give him some money." [Gearhart] suggested that Showers give him money to try and get the gunman to leave. Showers went upstairs and ultimately gave Krinock the $80 that he received from Victim. Showers went into the living room to see what was going on and then he went back into the basement.

Krinock exited the front door of the residence and handed the money to the gunman. Johnson stated that Krinock told the gunman, "this is all he had on him" or "this is what he's got." Victim also exited the front door of the residence and put himself between the gunman and Krinock. Victim told the gunman, "you know, underneath that mask I bet you're Zach McGrath [("McGrath")], I know who you are, you're Zach, I know you." The gunman became "incredibly defensive" and replied, "you don't know me, I'm not Zach, I don't know who Zach is." Victim then punched the gunman in the face and he stumbled backward. The gunman punched Victim with his pistol in the throat near his jaw. Victim struck the gunman in the face a second time and he stumbled onto the sidewalk. Johnson then struck the gunman in the back of his head while he was getting up. The gunman curled into a defensive position while still on his feet and Victim and Johnson continued to punch him. The gunman subsequently went to his knees and as he came back up, Victim attempted to take the gun from him. The gun went off and hit Victim in his stomach.

Johnson ran inside of the residence while the red dot from the weapon traced him up the stairs. He dove into the front entryway and heard a second shot. Johnson crawled into the living room and inspected himself for bullet wounds, but he did not see any. Showers and [Gearhart] were also inside of the residence. Showers testified that he went upstairs after hearing two (2) gunshots while he was in the basement. Johnson approached the screen door and saw Victim crawling up the stairs to get inside of the house. Johnson pulled Victim inside and asked him what happened. Victim told Johnson that he got shot.

Johnson lifted Victim's "hoodie" and t-shirt and observed two (2) bullet wounds in his abdomen.

Johnson started screaming, "we need to call 911, we need medics, we need an ambulance, we need the police, I need somebody to help." [Gearhart] told Johnson to put Victim in the back seat of his car and Johnson replied, "I can't treat gunshot wounds in the back seat of a car, I need an ambulance now." [Gearhart] stated, "we can't have cops here, I don't want to get in trouble." Showers attempted to call 911, but [Gearhart] took the phone out of Showers' hand and kept it away from him. Johnson testified that [Gearhart] did not want someone to call the police because he was afraid that he would get in trouble for having drugs inside of the house. Johnson continued to scream for medics and, after about ten (10) minutes, [Gearhart's] mother came downstairs. She asked if Victim was sick and [Gearhart] remarked that Victim "wasn't feeling well." Johnson told [Gearhart's] mother that Victim had been shot and needed to go to the hospital immediately. She assured Johnson that someone would be called for Victim or he would be taken to the hospital.

Showers and Johnson subsequently left the residence and drove directly to Colorado. About eight (8) or nine (9) hours into their trip, Showers received a phone call from a detective, who informed him that Victim died and [police] had his money and bags. Johnson testified that he did not know how the bags were removed from the vehicle. Detectives also notified Showers and Johnson that they wished to speak with them when they got back. Johnson pulled his vehicle over at the next rest stop and they confirmed that the bags were missing from the trunk. Johnson testified that the trunk was able to be opened from the interior of his vehicle.

Showers testified that, about nine (9) months prior to the incident, he had a dispute with Krinock over a girl. Specifically, he called Krinock a "broke bitch." Showers . . . believed that Krinock was angry enough with him over this remark that he would conspire with [Gearhart] and Zachary McGrath (hereinafter "McGrath") to rob him.

Robert Stewart (hereinafter "Stewart") testified that he received a call from McGrath soon after midnight on January 20, 2016, . . . [and] subsequently picked-up McGrath outside of a friend's house located a few blocks away from 409 St. Clair Street.

Stewart testified that . . . McGrath told him that he planned the robbery with Krinock and [Gearhart], and Krinock "bitched out."

* * * *

[Ben] Irvin [("Irvin")] testified that he would often go to 409 St. Clair Street to "hang out and party," which involved using drugs and alcohol. About one (1) or two (2) months prior to January 20, 2016, he saw three (3) pistols inside of 409 St. Clair Street. Specifically, he observed a .22-caliber pistol, a "big John Wayne" pistol, and a small black .9-millimeter pistol with a laser "dot." Irvin testified that the pistols were kept inside of a drill case that was moved between several different locations within the house. He believed that he saw the weapons upstairs in [Gearhart's] bedroom. Irvin mainly saw Krinock handle the weapons, but they were passed around among his friends. Irvin testified that he, Randy Nevin (hereinafter "Nevin"), McGrath, Krinock, and [Gearhart] could have been holding the weapons at any given time. Irvin heard McGrath, Krinock, and [Gearhart] use the phrase "hit a lick" inside of 409 St. Clair Street, which meant to "rob somebody." He believed that he mainly heard McGrath and Krinock use the phrase. Irvin, however, stated that any one of them could have stated "hit a lick" and he could not recall a specific occasion where [Gearhart] said it.

On January 19, 2016, Irvin went to 409 St. Clair Street with Nevin around 9:00 p.m. McGrath, Krinock, Parry, [Gearhart], and Joey Brubaker were also at the residence. Irvin recalled hearing [Gearhart] say, "they're on their way" or "they'll be here soon" that night. Irvin left the residence shortly after 9:00 p.m.

* * * *

Multiple Latrobe police officers testified that they responded to the incident at 409 St. Clair Street shortly after midnight on January 20, 2016. Officer Ronald Keslar testified that, when he reported to 409 St. Clair Street, he observed Victim lying on his back in the foyer of the residence with three (3) wounds to his abdomen. Victim was fading in and out of consciousness and Officer Tempo was applying direct pressure to Victim's wounds. Victim was asked what happened and he responded that he was shot by a male with a dark hooded sweatshirt. Subsequently, an ambulance arrived and Victim was transported to the hospital. Detective John Sleasman testified that he went to Latrobe Hospital

with Officer Tempo and attempted to speak with Victim, but he was unresponsive. Victim ultimately died as a result of his injuries.

[Gearhart], [his mother, Jennifer Stitt ("Stitt")], Krinock, [Destiny Parry ("Parry")], and Stitt's boyfriend, James Carns (hereinafter "Carns"), were at the residence that night. Officer Michelle Preston testified that she spoke with Krinock and [Gearhart] about the incident. Krinock informed Officer Preston that some friends left the residence and then ran back inside stating that a male was outside with a gun. Krinock did not believe them, so he went outside with Victim. They fought with the gunman so his friends could leave. Krinock heard gunshots and noticed Victim was shot. He identified "Chris" as the person who left. Additionally, Officer Keslar testified that [Gearhart] stated that there was a man outside wearing a dark hooded sweatshirt and a mask and he fled in an unknown direction after the robbery. He did not know the identity of the perpetrator of the robbery. Officer Preston also testified that she found Parry sleeping in a bedroom when she escorted Krinock upstairs to get more clothing. She awakened Parry and asked her multiple questions, including who[m] she was intimate with and Parry responded, "Zach." Officer Preston located a wallet containing McGrath's I.D. and Parry indicated it belonged to "Zach." Officer Preston asked Parry where "Zach" was and she said that he left a while ago.

At one point, officers wanted to secure the residence to preserve evidence. [Gearhart], Stitt, Krinock, Carns, and Parry were asked to exit the residence and remain on the porch area. Officer Keslar described the weather that night as "very cold" so the individuals were allowed to put on warm clothing. After about twenty (20) minutes, they were permitted to sit inside Stitt's vehicle and turn it on. The individuals were subsequently transported to the Latrobe Police Station. Officer Keslar testified that he determined the identity of Showers and Johnson via Facebook and their identities were confirmed by Krinock.

Officer Preston testified that she assisted detectives with a search outside of the residence. She located one (1) draw string bag and one (1) duffle bag on the side of the house. She opened one of the bags and observed a large sum of money and a laptop. It was later determined that the bag contained $12,000. Additionally, Officer Keslar located two (2) spent .9-millimeter shell casings in front of the residence. The shell casings were in

a location that was consistent with the information that [Gearhart] provided to the police. A canine handler for the Latrobe Police Department, Officer Robert Derk, testified that he attempted to track the assailant with his canine, but was unable to do so.

Additionally, a backpack was located inside a shed in the backyard of the residence. Drugs, drug paraphernalia, and a hard plastic case containing two (2) firearms were found inside the backpack. The weapons consisted of a loaded .44-caliber revolver and an unloaded .22-caliber semi-automatic pistol. Detective Sleasman obtained consent from Stitt to conduct a search of the residence. Officer Derk testified that vacuum sealed bags with a strong odor of marijuana and marijuana residue were located in the basement.

Once the individuals from 409 St. Clair Street arrived at the Latrobe Police Station, they were separated into different rooms. [Gearhart] and Stitt were placed inside the police station's processing room and they were advised that it contained video and audio surveillance, although the audio surveillance did not work at that time. Detective Ray Dupilka, who works as a detective for the Westmoreland County Detective Bureau, testified that he assisted with interviewing witnesses. Detectives interviewed Stitt, Carns, Parry, and Krinock respectively. [Gearhart] was thereafter interviewed while Stitt was present. He was about two (2) months from his eighteenth birthday at the time of the interview. [Gearhart] told detectives that Krinock and McGrath resided at the residence prior to the incident. On the evening of January 19, 2016, [Gearhart] was at the residence with McGrath, Parry, and Krinock. [Gearhart] asked his mother if he could have friends over and she agreed. At about 9:00 p.m., Victim arrived at the residence. McGrath left shortly thereafter and did not return. About one (1) hour after Victim arrived, Showers and Johnson came to the residence. They stayed for about one (1) hour and then left. After they left, [Gearhart] heard an altercation outside. Moments later, Showers ran back inside and indicated that there was an unknown masked individual holding Johnson at gunpoint on the street. Victim and Krinock went outside to assist Johnson and [Gearhart] heard a gunshot. Johnson and Krinock carried Victim inside of the residence because Victim got shot. Johnson and Krinock attempted to render aid to Victim until Stitt contacted 911. Johnson and Showers left the residence after 911 was called.

Detective Klawinski thereafter arrived at the Latrobe Police Department and, informed detectives that they found a backpack inside a storage shed at the rear of the residence that contained drugs, drug paraphernalia, and a plastic tool case with two (2) firearms. He also told detectives that they found two (2) bags, one (1) of which contained $12,000. Detective Dupilka was additionally notified that Victim died as a result of his injuries.

Detectives confronted [Gearhart] with this new information and he indicated that he had not been truthful. He provided detectives with a different set of facts regarding the incident. Specifically, [Gearhart] told detectives that they contacted Showers earlier in the day about coming to the residence to sell drugs. Prior to Showers' and Johnson's arrival, McGrath left the residence and did not return. Once Showers and Johnson arrived, Showers sold cocaine to Victim for $80. Showers and Johnson left the residence after about one (1) hour. After they left, they heard an altercation on the street. Showers went back inside the residence and told everyone that there was a male in all black clothing holding Johnson at gunpoint outside. Krinock and Victim went outside and [Gearhart] heard a gunshot. Johnson and Krinock carried Victim inside and [Gearhart] saw that Victim was shot. Johnson and Krinock tended to Victim's wounds. [Gearhart] panicked and cleaned the interior of the residence of incriminating items with Krinock. Krinock placed a backpack with firearms, marijuana, and drug paraphernalia inside of the shed. They delayed contacting 911 for eight (8) to ten (10) minutes until those items were removed. Showers and Johnson left after 911 was called.

Detective Dupilka asked [Gearhart] about the identity of the shooter and he confessed to knowing that McGrath was the shooter. He knew that McGrath was the shooter because, prior to Showers' and Johnson's arrival, [Gearhart], McGrath, and Krinock planned on robbing Showers of his money and/or drugs. [Gearhart] knew Showers was going to Colorado and he kept large amounts of money and/or drugs with him, so he was the target of the robbery. He also knew that McGrath and Krinock possessed a .44-caliber revolver, .22-caliber pistol, and a .9-millimeter pistol concealed inside of a plastic tool box. [Gearhart] told Detective Dupilka that, prior to Showers' arrival, he messaged Krinock through Facebook Messenger on his phone and told him that he did not think the robbery was a good idea. Krinock told [Gearhart] not to "puss out" and he would still get his cut of the proceeds of

the robbery. [Gearhart] believed that Krinock and McGrath maintained contact via text message after McGrath left the residence and Krinock was keeping McGrath apprised of Showers' movements. [Gearhart] and Stitt agreed to participate in an audio-recorded interview and this interview was played for the jury. In his recorded statement, [Gearhart] did not specifically state that he was involved the planning of the robbery. [Gearhart], however, again stated that he was told not to "puss out" and that he would get his cut of the proceeds of the robbery.

[Gearhart] agreed to provide his cellular phone to investigators. Call data information from [Gearhart's] phone revealed four (4) outgoing calls from [Gearhart's] phone to Showers' phone on the evening of January 19, 2016. Donald Lucas (hereinafter "Lucas") testified as an expert in forensic analysis of electronic equipment. Upon examination of [Gearhart's] phone, he found that only one (1) of the calls between [Gearhart] and Showers was present on the phone's call log and he believed the other calls were likely deleted. Call data records also revealed nine (9) text messages between [Gearhart] and Showers on the evening of the incident. Lucas testified that these text messages were not on [Gearhart's] phone and they were likely deleted. Three (3) images were also recovered from [Gearhart's] phone and Lucas testified that these images were most likely deleted. The first image depicted a green tool box containing a large frame revolver and a small frame semi-automatic pistol. The second picture was of a black semi-automatic pistol on top of bedding with a magazine inserted into it and a laser sight activated. The third picture showed [Gearhart] holding a silver frame semi-automatic pistol with a detachable box magazine removed with a silver jacketed bullet loaded into the magazine. Detective Dupilka testified that the weapons in the pictures are similar to the ones that were recovered in this case. Lucas also testified that he did not find any "artifacts" of Facebook or Facebook Messenger on [Gearhart's] phone. Additionally, call data records from Krinock's phone revealed communication between Krinock and McGrath from 11:30 p.m. to 11:58 p.m. on the night of the incident. . . .

* * * *

Dr. Cyril Wecht testified as an expert in forensic pathology. He performed an autopsy on Victim on January 20, 2016. . . . Dr. Wecht believed that, if Victim received prompt treatment with

trained EMTs and surgical intervention, there would have been "quite a reasonable chance for recovery because the internal organs had not been damaged."

Trial Court Opinion, 10/8/19, at 2-15 (unnecessary capitalization and references to the record omitted).[2]

At the conclusion of trial, the jury convicted Gearhart of third-degree murder, robbery and conspiracy. The trial court imposed an aggregate sentence of ten to twenty years in prison. Gearhart filed post-sentence motions, which the trial court denied. Gearhart thereafter filed a timely notice of appeal. Both Gearhart and the trial court complied with Pa.R.A.P. 1925.

Gearhart raises the following issues for our review:

1. Whether the evidence presented at trial was insufficient as a matter of law to support a verdict of guilty with respect to third[-]degree murder.

2. Whether the verdict was against the weight of the evidence.

3. Whether the court below erred in preventing counsel from cross-examining witnesses with respect to relevant and admissible statements made by a co-defendant.

4. Whether the court below erred in failing to suppress [Gearhart's] statements made to police.

Gearhart's Brief at 5 (unnecessary capitalization omitted).

_____

[2] In its opinion, the trial court spelled Mcnerney as "McNerny," and Carns as "Carnes." However, the record indicates that the correct spelling for these names is McNerney and Carns. Therefore, we have altered the trial court's opinion to reflect the correct spelling of these names.

- 11 -

In his first issue, Gearhart contends that the evidence presented at trial was insufficient to support his conviction for third-degree murder. Our scope and standard of review of a sufficiency claim is well-settled:

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

Commonwealth v. Franklin, 69 A.3d 719, 722 (Pa. Super. 2013) (citations and quotation marks omitted).

The Pennsylvania Crimes Code defines third-degree murder as any killing with malice that is not first or second-degree murder. See 18 Pa.C.S.A. § 2502(c); see also Commonwealth v. Baskerville, 681 A.2d 195, 199-200 (Pa. Super. 1996).

A person is guilty of conspiracy to commit a crime if with the intent of promoting or facilitating its commission, he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a). Thus, in order to prove conspiracy, the Commonwealth must demonstrate that the defendant: "(1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." Commonwealth v. Rios, 684 A.2d 1025, 1030 (Pa. 1996); see also 18 Pa.C.S.A. § 903. Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy. Commonwealth v. Miller, 364 A.2d 886, 887 (Pa. 1976).

Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. Commonwealth v. Spotz, 716 A.2d 580, 592 (Pa. 1998). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." Commonwealth v. Strantz, 195 A. 75, 80 (Pa. 1937). Indeed, "[a] conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed." Commonwealth v. Kennedy, 453 A.2d 927, 929, 930 (Pa. 1982).

Gearhart argues that, because there was no evidence that he shot Victim, Gearhart could only be found guilty of the murder as an accomplice

- 13 -

under 18 Pa.C.S.A. § 306(c).[3] Gearhart claims that the evidence, even when viewed in the light most favorable to the Commonwealth, showed that he helped plan the robbery of Showers, and that he delayed the calling of 911 after Victim was shot in order to hide drugs. Gearhart asserts that there is no evidence that he promoted or facilitated the killing of Victim, or that he solicited, aided, or agreed or attempted to aid McGrath in killing Victim. According to Gearhart, the evidence showed only that he facilitated or aided in the crime of robbery, and that the requirements for accomplice liability for murder were not met.[4]

Notably, at trial, the Commonwealth argued that Gearhart was responsible for Victim's murder based on either criminal conspiracy under 18

_____

[3] Pursuant to § 306, "[a] person is an accomplice of another person in the commission of an offense if: . . . with the intent of promoting or facilitating the commission of the offense, he: (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it. 18 Pa.C.S.A. § 306(c).

[4] Gearhart additionally argues that "the evidence presented fell short of being sufficient to establish the requisite malice for him to be convicted of third-degree murder." Gearhart's Brief at 14. However, Gearhart provides no discussion of the mens rea required for criminal conspiracy to commit third-degree murder, nor any explanation of this argument. Thus, we deem it waived. See Commonwealth v. Heggins, 809 A,2d 908, 912 n.2 (Pa. Super. 2002) (holding that an issue identified on appeal but not developed in appellant's brief of abandoned and therefore waived). Moreover, even if Gearhart had developed the argument, we would have concluded it lacked merit for the reasons expressed by the trial court in its opinion. See Trial Court Opinion, 10/8/19, at 22-23.

Pa.C.S.A. § 903(a) or accomplice liability under § 306(a). However, the jury found Gearhart guilty of criminal conspiracy to commit third-degree murder under § 903(a). As such, Gearhart's sufficiency argument relating to accomplice liability under § 306 is irrelevant. Gearhart does not discuss his conviction for conspiracy, or argue that the evidence was insufficient to support that conviction. Based on these deficiencies, Gearhart has failed to establish that his first issue merits any relief.[5]

In his second issue, Gearhart challenges the weight of the evidence supporting his guilty verdicts. The following legal principles apply when a challenge to the weight of the evidence supporting a conviction is presented to the trial court:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of

_____

[5] In its opinion, the trial court set forth the elements of criminal conspiracy under § 903, and provided a thorough discussion as to why the evidence was sufficient to support Gearhart's conviction for conspiracy to commit murder. See Trial Court Opinion, 10/8/19, at 20-22.

greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

Commonwealth v. Widmer, 744 A.2d 745, 751-52 (Pa. 2000) (citations, footnotes and quotation marks omitted). The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Cousar, 928 A.2d 1025, 1036 (Pa. 2007)

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Commonwealth v. Clay, 64 A.3d 1049, 1054-55 (Pa. 2013) (emphasis in original, internal citations omitted). The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses. Commonwealth v. Boyd, 73 A.3d 1269, 1274 (Pa. Super. 2013) (en banc).

Gearhart claims that "the evidence as a whole did not support the conclusion beyond a reasonable doubt that . . . Gearhart was a co-conspirator, or that he aided or otherwise agreed with . . . McGrath and . . . Krinock for the robbery to be committed." Gearhart's Brief at 15. According to Gearhart, "the evidence clearly showed that the agreement was between [McGrath] and [Krinock] . . . [and a]ny involvement that [Gearhart] may have had was de minimus at best." Id. Gearhart additionally argues that he communicated to Krinock that he did not want for them to follow through with the robbery. Id.

The trial court considered Gearhart's weight challenge and determined that, in light of the evidence presented by the Commonwealth at trial, the guilty verdicts were not so contrary to the evidence presented at trial as to shock one's sense of justice. See Trial Court Opinion, 10/8/19, at 24.

As noted above, appellate review of a weight of the evidence claim is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. See Cousar, 928 A.2d at 1036. We discern no abuse of discretion by the trial court in rejecting Gearhart's weight challenge. The facts and inferences from the evidence presented at trial by the Commonwealth support a determination by the jury that Gearhart was involved in the planning and commission of the armed robbery of Showers by McGrath. Thus, Gearhart's second issue merits no relief.

In his third issue, Gearhart contends that the trial court erred by sustaining the Commonwealth's objection to defense counsel's attempt to elicit hearsay testimony from Commonwealth witness, Ben Irvin. Our standard of review concerning the admissibility of evidence at trial is well-settled:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

Commonwealth v. Woodard, 129 A.3d 480, 494 (Pa. 2015).

Hearsay means "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is not admissible except as provided by our Rules of Evidence, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa.R.E. 802.

Gearhart concedes that the subject testimony would have been hearsay, but argues that it should have been admitted as an exception to the hearsay rule under Pa.R.E. 804. Rule 804 provides certain exceptions to the rule against hearsay when the declarant is unavailable as a witness. One such exception pertains to statements against interest under subsection (b)(3).

The version of the exception which was in effect at the time of Gearhart's trial

provided as follows:

> (b) The Exceptions.  The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
> . . . .
>
> (3) Statement Against Interest.  A statement that:
>
>> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so  contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>>
>> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3).[6]

Our Supreme Court has identified four criteria which must be met in

order to satisfy the exception provided by Rule 804(b)(3):  (1) the declarant

made a statement;  (2) the declarant was, at the time of trial, unavailable as

a witness;  (3) the statement at the time of its making so far tended to subject

the declarant to criminal liability that a reasonable person in the declarant's

position would not have made the statement unless believing it to be true;

---

[6] In his brief, Gearhart did not cite or reference the version of Rule 804 which was in effect at the time of his 2019 trial.  Instead, he merely provided the version of the rule which was in effect in 2006, as cited in Commonwealth v. Brown, 52 A.3d 1139, 1176 (Pa. 2012).

and (4) corroborating circumstances clearly indicate the trustworthiness of the statement.  See Brown, 52 A.3d at 1176.

"A demonstration of trustworthiness is of particular importance where the hearsay statement is that of an accomplice implicating his coconspirator; as such statements are viewed with great suspicion and are presumptively unreliable."  Commonwealth v. Robins, 266, 812 A.2d 514, 525 (Pa. 2002). Similarly, "[a] statement that exculpates a declarant's accomplice lacks the safeguards of trustworthiness attributed to a statement truly against interest." Commonwealth v. Colon, 846 A.2d 747, 757 (Pa. Super. 2004).

The circumstances to be examined in this inquiry are limited to those attendant to the making of the statement; and in this regard, the use of hindsight or 'bootstrapping' based upon independent evidence is proscribed." Id.  Among the factors a court might consider in determining the reliability of inculpatory or exculpatory statements are:

> the circumstances under which the statements were uttered, including the custodial/non-custodial aspect of the setting and the identity of the listener; the contents of the statement, including whether the statements minimize the responsibility of the declarant or spread or shift the blame; other possible motivations of the declarant, including improper motive such as to lie, curry favor, or distort the truth; the nature and degree of the "against interest" aspect of the statements, including the extent to which the declarant apprehends that the making of the statement is likely to actually subject him to criminal liability; the circumstances or events that prompted the statements, including whether they were made with the encouragement or at the request of a listener; the timing of the statement in relation to events described; the declarant's relationship to the defendant; and any other factors bearing upon the reliability of the statement at issue.

Id. at 525-26.

Gearhart asserts that Irvin assisted McGrath after the shooting, and that McGrath told Irvin that McGrath and Krinock had planned to rob Showers. When the defense attempted to elicit this statement from Irvin in order to show that Gearhart was not involved in planning the robbery, the trial court sustained the Commonwealth's hearsay objection. Gearhart argues that, although the testimony was hearsay, it should have been admitted under Rule 804 because the statement was inculpatory, relevant, and trustworthy. Gearhart maintains that McGrath's description of the shooting was similar to the descriptions provided by Showers and Johnson, the statement was made when McGrath was confiding in someone he trusted (i.e., Irvin), and McGrath admitted that he shot Victim and did not try to minimize his role. Gearhart argues that McGrath never mentioned Gearhart's name, and there did not appear to be any attempt by McGrath to exonerate Gearhart.

Gearhart points to Brown, and argues that it is "nearly directly on point." Gearhart's Brief at 16. In Brown, the defendant sought to introduce written and videotaped confessions made to police by his co-defendant, Walker. In the confessions, which were made after Walker was provided with Miranda[7] warnings, Walker admitted to planning and carrying out a shooting with his two half-brothers. Walker explained their joint involvement in a

_____

[7] See Miranda v. Arizona, 384 U.S. 436 (1966).

conspiracy to distribute cocaine, offered a motive for the shooting, described the weapons he and his half-brothers used in the shooting, and denied Brown's involvement in the shooting. Brown, 52 A.3d at 1145. Walker later pled guilty, and at his plea hearing repudiated his claim in the confessions that Brown was not present at the scene and, testified that Brown possessed a .38 caliber weapon which Brown fired at the victims. Id. at 1151. The trial court determined that Walker's prior confessions exonerating Brown were not admissible under Rule 804(b)(3) because they did not expose Walker to any additional punishment. Id. This Court affirmed the trial court's decision in a divided unpublished memorandum. Commonwealth v. Brown, 970 A.2d 464 (Pa. Super. 2009). Our Supreme Court reversed. It determined that there existed sufficient corroborating circumstances to clearly indicate the trustworthiness of Walker's confessions. Brown, 52 A.3d at 1177. The High Court reasoned:

> Walker gave his confessions after Miranda warnings were administered by the police, apprising him of the consequences that would flow from his confessions, namely, that they would be used in a court of law against him. Nevertheless, Walker freely and openly admitted to his commission of the aforementioned criminal acts, describing in intricate detail: the creation of a pact with two other individuals to kill Williams; their planning of the killing; the implementation of those plans by the execution of a coordinated ambush on Williams and his companions; and the steps they took, together, to conceal their involvement after the shootings. Notably, Walker gave a graphic description of his own slaying of Williams, describing how Williams' body jumped from the force of impact from the bullets he fired. Walker expressly acknowledged that he was not promised anything for his confessions by the police, and further offered that he had been threatened with death by one of the individuals if he cooperated

- 22 -

with the police. Thus, Walker had a strong incentive not to implicate those two individuals to the police, and the fact that he did so imparted greater reliability to his confessions.

Also, Walker gave a nearly identical account of his criminal actions, both in his written confession and, significantly, in the confession which was videotaped by the investigating detectives. As [Brown] notes, this was not a situation where a self inculpatory statement was given in a remote setting where there were no witnesses, and the recipient of the statement was a person of questionable character. Instead, these confessions were given in a police station to detectives who scrupulously recorded every word in writing and with a video camera exactly as Walker said them. Hence, Walker's confessions were given under conditions which gave maximum assurance that their contents were an accurate reflection of what he said.

Moreover, in making these confessions, Walker did not try to shift the responsibility for his actions from himself to anyone else. While he also implicated his half-brothers, he did so only in the context of explaining his own involvement with them in the commission of the crimes. Although he indicated that he felt some reluctance at one point in participating with his half-brothers in the commission of the crimes, he, nevertheless, admitted to willingly doing so and never suggested that they coerced, threatened or otherwise forced him to do so. Also, Walker's primary purpose in giving his confessions did not seem to be a desire to exonerate [Brown], as he did not, in those confessions, bring up [Brown's] non-involvement—except in response to inquiries from the investigating detectives.

Additionally, and importantly, Walker's confessions included critical details which comported with the physical evidence recovered from the crime scene and from the victims' bodies and clothing.

Brown, 52 A.3d at 1177-78.

The trial court considered Gearhart's evidentiary challenge and determined that the hearsay statement did not fall within the statement

against interest exception provided by Rule 804(b)(3). The court reasoned as follows:

> In the case sub judice, this court finds that the statement at issue does not fall within the statement against interest hearsay exception because the portion of McGrath's statement specifically regarding Krinock was not self-inculpatory to McGrath. During trial, [Gearhart] did not intend to elicit McGrath's statement from Irvin to show that McGrath admitted to planning the robbery. Rather, [Gearhart] intended to elicit this statement to demonstrate that McGrath did not implicate [Gearhart] in the robbery and that [Gearhart] was not involved. The portion of McGrath's statement that specifically mentions Krinock, however, was only self-inculpatory to Krinock. Ultimately, this court agrees with the Commonwealth that the "non-inculpatory portion of McGrath's statement was collateral to his statement and inadmissible hearsay."
>
> Furthermore, upon review of the totality of the circumstances, McGrath's statement is not supported by corroborating circumstances that clearly indicate its trustworthiness. This Court was unaware of the context in which the statement was given and when it was prompted. Defense counsel even noted during trial that he did not know when the statement was made because its timing was not clear based on the evidence. The statement seemed to be an off-the-cuff remark that lacked sufficient detail. McGrath very well may have been talking about who was supposed to be outside executing the plan or he may have been talking about how everything started and who was involved with what. He also may have intended to shift the blame to Krinock when making the statement considering he was aware that Victim was dead and the police were looking for him. There was also testimony from one of the witnesses that McGrath stated that Krinock was supposed to be there too but he "bitched out" and this could have been what they were discussing. The reliability of the statement was also questionable considering that Irvin provided contradicting testimony regarding a different matter at trial, which was highlighted to the jury by [Gearhart].

Trial Court Opinion, 10/8/19, at 28-29 (unnecessary capitalization and citations to the record omitted).

The trial court also determined that the hearsay statement at issue in Brown was distinguishable because the circumstances providing the indicia of trustworthiness in that case simply were not present in the instant matter. The trial court explained:

> [U]nlike the statements at issue in Brown, there is very little detail surrounding the statement that was made here and the context in which it was given. The statement lacks sufficient detail, unlike the statements in Brown. The situation in the instant case was exactly one in which a self-inculpatory statement was given in a remote setting with no witnesses. The recipient, Irvin, was certainly a person of questionable character who assisted McGrath with evading the police. The statement was not recorded in any manner, McGrath did not give the statement to officers, McGrath was not informed of his [Miranda] rights prior to making the statement, and McGrath never specifically exculpated [Gearhart]. For all of these reasons, [Gearhart's] reliance on Brown is misplaced and his claim is without merit.

Id. at 30.

We discern no abuse of discretion by the trial court in concluding that the out-of-court statement made by McGrath to Irvin constituted inadmissible hearsay because it was not supported by corroborating circumstances that clearly indicate the trustworthiness required by Rule 804(b)(3). Moreover, McGrath's statement to Irvin did not exonerate Gearhart or indicate that Gearhart was not involved in the conspiracy to rob Showers; rather, the statement merely identified Krinock as one co-conspirator. Accordingly, Gearhart's third issue merits no relief.

In his final issue, Gearhart contends that the trial court erred in denying suppression of his statements to police. On appeal from the denial of a suppression motion:

> Our standard of review . . . is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

Commonwealth v. Galendez, 27 A.3d 1042, 1045 (Pa. Super. 2011) (en banc) (citation omitted). Additionally, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." Commonwealth v. Bush, 166 A.3d 1278, 1281-82 (Pa. Super. 2017) (citation omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." Id. at 1282 (citation omitted).

> Juveniles, as well as adults, are entitled to be apprised of their constitutional rights pursuant to Miranda. If a person is not advised of his Miranda rights prior to custodial interrogation by law enforcement officers, evidence resulting from such interrogation cannot be used against him. A person is deemed to be in custody for Miranda purposes when [he] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation.

In re Appeal of B.T., 82 A.3d 431, 436 (Pa. Super. 2013) (citation omitted).

Further, as this Court has explained:

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra at 444, . . . [T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, [i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. [I]n evaluating whether Miranda warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without Miranda warnings.

* * *

[T]he test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [his] freedom of action is being restricted.

* * *

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

Thus, the ultimate inquiry for determining whether an individual is in custody for Miranda purposes is whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Under the totality of the circumstances approach, the following factors are relevant to whether a detention has become so coercive as to constitute the functional equivalent of a formal arrest: the basis for the detention; its length; its location; whether the suspect was transported against his will, how far, and why; whether restraints were used; whether the law enforcement officer showed,

- 27 -

threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

In the Interest of N.M., 222 A.3d 759, 770-71 (Pa. Super. 2019) (citations omitted).

Gearhart argues that his statements to police should have been suppressed because he was not provided with a Miranda warning prior to the interview. Gearhart maintains that, under the totality of the circumstances, he was subjected to the functional equivalent of an arrest. In making this argument, Gearhart points to the fact that he and the other individuals at the crimes scene were directed outside where the temperature was very cold. Gearhart directs us to Stitt's disputed testimony that the individuals were not permitted to get warm clothing before going outside, nor allowed to turn on Stitt's car for warmth, and were told by police not to leave the scene.

Gearhart further asserts that, after police transported them to the Latrobe Police Station, he and Stitt were directed to a cold room. Gearhart concedes that he was advised by police that he was not under arrest; however, he asserts that he was never told that he was free to leave. He argues that the trial testimony provided by police officers established that he was not free to leave. Additionally, he contends that, as a seventeen-year-old at the time of the interrogation, he could not have reasonably thought that he was free to leave. On this basis, Gearhart claims that he should have been provided with Miranda warnings before police questioned him. He claims that, without

such warnings, the interview was presumptively coercive, and his statements should have been suppressed.

During the suppression hearing, the Commonwealth presented the testimony of Officers Keslar and Derk, and Detective Dupilka, who collectively testified as follows. Police were summoned to 409 St. Clair Street about twenty-five minutes after midnight on January 20, 2016, and arrived at the crime scene a few minutes later. N.T. Suppression, 3/9/18, at 5-6. Upon their arrival, the found the Victim just inside the front door of the residence with three gunshot wounds to his abdomen. Id. at 6. Several individuals were in the residence; namely, Gearhart, Stitts, McGrath, Krinock, Carns, and Parry. Id. at 7-8. The occupants told the police that Victim was shot by an unknown assailant wearing a dark mask and hooded sweatshirt. Id. at 8. The police asked the occupants of the residence to come outside so that police could secure the crime scene. Id. at 9. None of the individuals resisted moving outside. Id. Because it was cold outside, the police gave the individuals an opportunity to take clothing with them outside, including coats, hats and gloves. Id. Officers Keslar and Derk could not recall whether the individuals did take warm clothing outside with them. Id. at 16, 24. The officers allowed the individuals to sit in Stitts' vehicle, which was parked near the front of the residence, while the police processed the crime scene. Id. at 10, 24. Officer Derk testified that the car was started up. Id. at 25. No threats were made or force used to get the individuals from the house to the

car, nor were they ever told that they were under arrest. Id. The individuals were cooperative, and did not complain or object to police requests. Id. at 9, 27-28.

At this point in time, the police did not have any reason to suspect that any of the individuals in the residence were involved in shooting Victim. Id. at 27. Instead, the police were on a fact-finding course to determine the circumstances leading up to and following the shooting. Id. at 36. Police asked the individuals to accompany them back to the police station to get further statements and interviews with them. Id. at 11. Police told all of the individuals, including Gearhart, that they were not under arrest, and that they were under no obligation to speak to detectives. Id. at 35. No force or threats or were made to Gearhart or his mother to come to the police station, and they were cooperative and willingly agreed to go. Id. at 12, 27. Because Stitts' vehicle was within the crime scene, police did not want her car to be moved. Id. at 17, 24. Therefore, at approximately 1:30 a.m., Officer Keslar transported Gearhart, Stitts, and Krinock to the police station located five to six blocks away. Id. at 10-11.

At the police station, Gearhart and Stitts were directed to the processing room, while Officer Keslar took Krinock to the squad room. Id. at 12-13. Gearhart and Stitts were left alone in the processing room, and the door was left open. Id. at 13. There were no locked doors preventing their departure, and they could have proceeded out of the police station if they had wanted to

leave. *Id.* Gearhart and Stitts were not threatened to remain in the processing room, nor did they voice any objection to being there. *Id.* at 14. However, Officer Keslar did advise Gearhart and Stitts that the processing room was under constant video and audio surveillance. *Id.* at 18. Officer Keslar periodically checked on Gearhart and Stitt to see if they needed anything, and they appeared "fine." *Id.* at 13. Gearhart was not restrained in any way from the time police arrived at the residence through the time he remained in the processing room. *Id.* at 15. Detective Dupilka indicated that, following the shooting, he was summoned to the Latrobe police station, and arrived there at approximately 1:45 a.m. *Id.* at 31. He interviewed Stitt first, at approximately 2:25 a.m. *Id.* at 32. He then interviewed Carns at 2:45 a.m. *Id.* Detective Dupilka interviewed Parry at 2:56 a.m. *Id.* Detective Dupilka began to interview Krinock at 3:15 a.m., and thereafter obtained a DNA sample from him. *Id.* Gearhart's interview began at 4:20 a.m. *Id.* at 34.

In the presence of Gearhart's mother, Stitt, Detective Dupilka explained to Gearhart that he was not under arrest, and that, based on the incident that occurred outside his residence, the police wanted to know whether he would agree to permit them to interview him to determine the facts and circumstances surrounding the shooting. *Id.* at 36. Gearhart, who was two months away from his eighteenth birthday, agreed to be interviewed by police.

Id. at 36-37. Gearhart initially told police that there was a confrontation in front of his house, and that Victim was shot by an unknown actor. Id. at 38.

During the interview, the police stepped outside the processing room and were informed that Victim had died of his gunshot wounds. Id. at 40. The police were additionally advised that officers recovered a duffel bag in a shed behind Stitt's residence containing two handguns, marijuana, and drug paraphernalia. Id. at 39-40. The officers also found two duffel bags on the side of Stitts' residence containing a large sum of money and clothing items. Id. at 40. The police went back into the processing room and conducted a further interview of Gearhart and Stitts which was recorded. Id. at 41. When interviewed regarding the additional information, Gearhart admitted that he had been untruthful, and stated that there had been a pre-planned robbery prior to the shooting, and he knew the identity of the shooter. Id. at 41. Gearhart did not identify himself as one if the individuals involved in planning the robbery. Id. at 62. When the interview was concluded, police gave Gearhart and his mother a ride back to their home, which officers had finished processing. Id. at 64.

The defense presented the testimony of Stitts, who stated that the individuals were not allowed to take anything from inside the residence when they were asked to go outside. Id. at 75-76. She further indicated that, while they were permitted to sit in her car, the car was not turned on because they were not allowed to have the key. Id. at 77. According to Stitts, police told

the individuals that they were not permitted to leave the scene.  Id. at 76-77.

At the suppression hearing, the court admitted into evidence Gearhart's juvenile criminal history, which reflected his past involvement with the criminal justice system, including prior arrests for retail theft and underage drinking.  Id. at 66.

The trial court considered Gearhart's final issue and determined that it lacked merit.  It explained its reasoning as follows:

> In the case sub judice, this court finds that under the totality of the circumstances [Gearhart] was not subject to a custodial interrogation and Miranda warnings were not required.  Several factors support the Commonwealth's assertion that [Gearhart] was not subject to a custodial interrogation.  [Gearhart] and the other individuals who were present were asked by police to relocate to the living room and then front porch area of the residence so that the crime scene could be secured and preserved.  No one objected to any of these requests and everyone who was present was cooperative.  There was conflicting testimony as to whether [Gearhart] and the individuals were allowed to obtain warm clothing from inside of the residence to wear while waiting outside in the cold weather.  Nevertheless, they were eventually permitted to wait inside of Stitt's vehicle.  Conflicting testimony was also presented as to whether the vehicle was started at the time they were sitting inside.  [Gearhart] consented to being transported to the police station for further questioning, which was located within a short distance from [Gearhart's] house.  Officer Keslar testified that none of the individuals objected to being transported to the police station and they were not threatened.  Stitt's vehicle was considered to be part of the crime scene; therefore, she was unable to drive it to the police station.
>
> Additionally, at the police station, [Gearhart] was directed to wait inside of the processing room with his mother, Stitt, for further questioning.  [Gearhart] and Stitt were not supervised while in the processing room and the door to the room was left open.  Officer Keslar testified that it was possible for [Gearhart] and Stitt to leave

the processing room and the police department. The processing room was being recorded and [Gearhart] and Stitt were aware of this; however, the processing room was under routine surveillance and the footage of [Gearhart] was not maintained. Officer Keslar continuously checked on [Gearhart] and Stitt while they were in the processing room and he believed that they appeared to be "fine." They did not indicate that they needed anything when asked and they did not object to waiting in the processing room. [Gearhart] was not restrained at any time.

Also, [Gearhart] was informed that he was not under arrest and he was under no obligation to speak with the Detectives. Detective Dupilka told [Gearhart] that he was on a fact-finding interview to determine the circumstances surrounding the shooting and [Gearhart] consented to the interview. Stitt often encouraged the Detectives to get as much information about the incident as possible in front of [Gearhart]. [Gearhart] did not express any objection to the interview and did not display any hesitancy in answering any questions. Additionally, [Gearhart] did not express any desire to leave the premises. Detective Dupilka testified that [Gearhart] was free to leave if he wanted to, although he did not recall specifically informing [Gearhart] of this. [Gearhart] engaged in a series of three (3) interviews; however, each interview did not occur for a significant period of time. Although Stitt testified that she had asked about leaving for an appointment in the morning, Stitt was able to leave to complete her appointment and she did not testify that [Gearhart] requested to leave at any point. [Gearhart] also has a juvenile criminal record and has prior experience with the law. Thus, based on the foregoing, it was not necessary for Miranda warnings to be read to [Gearhart.]

Trial Court Opinion, 10/8/19, at 36-37 (unnecessary capitalization omitted).

As noted above, our review of a suppression ruling on appeal is limited. We may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Galendez, 27 A.3d at 1045. Thus, we may not consider Stitts' testimony, as it constitutes defense evidence which was contradicted by the police witnesses.

Based on the evidence presented by the prosecution, we conclude that the record supports the findings of the suppression court that Gearhart was not in custody when he was interviewed by police. At the time he was questioned, Gearhart had not been formally arrested, and there was no restraint on his freedom of movement of the degree associated with a formal arrest. See In the Interest of N.M., supra. Gearhart voluntarily agreed to a police interview, and to be transported to the nearby police station a few blocks away. No restraints were placed on Gearhart, and the police never showed, threatened or used force on him at any time. Importantly, at the time Gearhart consented to be interviewed by police, Gearhart was not a suspect, and the basis for Gearhart's detention by police was to determine the facts and circumstances of a shooting which occurred at his residence. At the police station, Gearhart was directed to an open processing room which he could have left at any time and departed the police station. While the record reflects that Gearhart's interview did not start until 4:20 a.m., there is no indication in the record when it ended, or that the duration of the interview was excessive. As such, we cannot agree with Gearhart's claim that his interaction with police was the functional equivalent of an arrest, or that his voluntary interview was a custodial interrogation.[8]

_____

[8] Notably, Gearhart does not argue that the interview became custodial when the interviewing detective and officers were informed of the guns, drugs and large amount of cash found at Gearhart's residence, and thereafter requested

Accordingly, as the suppression court's findings are supported by the record, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. Galendez, 27 A.3d 1045. As we discern no legal error, we affirm the suppression court's ruling.

Having found no merit to any of Gearhart's issues, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/22/2020


_____

his consent to record the remainder of the interview. As Gearhart did not make this argument to either the trial court or to this Court, or develop it in the suppression record, we have not considered it in our analysis. See Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and cannot be raised for the first time on appeal); see also Commonwealth v. Le, 208 A.3d 960, 976 n.17 (Pa. 2019) (holding that it is not an appellate court's function to act as an advocate for the parties); Commonwealth v. Capitolo, 498 A.2d 806, 811 (Pa. 1985) (refusing to address an argument not raised in the trial court, and holding that "[w]e require strict compliance with the procedures designed for issue preservation to save judicial manpower, and to prevent our appellate courts from becoming advocates for parties instead of adjudicators of the issues they present for our review"); Commonwealth v. Kane, 10 A.3d 327, 331 (Pa. Super. 2010) (holding that "[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant") (citations omitted).