COMMONWEALTH of Pennsylvania, Appellee,

v.

Franklin COLON, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 12, 2004.

Filed March 30, 2004.

Michael E. Brunnabend, Allentown, for appellant.

James B. Martin, Asst. Dist. Atty., Allentown, for Com., appellee.

BEFORE: JOYCE, OLSZEWSKI, and JOHNSON, JJ.

OPINION BY OLSZEWSKI, J.:

¶ 1 Franklin Colon, appellant, has brought this appeal from his judgment of sentence following a jury verdict of guilty on charges of robbery, conspiracy to commit robbery, and second-degree murder. The trial judge summarized the facts of this case as follows:

> [Franklin Colon and Joey Gonzales], along with another confederate, Eliut Betancourt, were in search of money on the evening of October 29, 2001, and hatched a plan. Armed with a handgun that had been passed among the three of them, they set out to find an easy victim from whom they could steal. Driving Betancourt's Honda Accord around the streets of Allentown in search of prey, they found no one suitable for the contemplated crime. They proceeded to the Lehigh Valley Mall ... just outside of the City of Allentown. While Colon waited in the car, Gonzalez accompanied

Betancourt as they observed patrons and waited for the opportunity to strike. Tragically for her, Carol D'Odoardo had gone to the mall that night to buy a present. As she exited Macy's department store, Gonzalez and Betancourt followed. A struggle ensued when the perpetrators accosted Ms. D'Odoardo as she tried to enter her car. Two shots were fired, hitting Ms. D'Odoardo in the leg and face. Gonzalez and Betancourt ran back to their car and, with the assistance of Colon at the wheel, fled the scene. Meanwhile, Ms. D'Odoardo managed to stumble back toward the entrance of the mall to seek help. She did not make it. She collapsed and died in the mall parking lot.

Unfortunately for the defendants, two key witnesses emerged. One, an employee of Macy's, happened to notice the Honda Accord in the parking lot. His attention was drawn to the vehicle because it was in a place usually reserved for employee parking. Sensing that something might be awry, he wrote down the license number and, after arriving home, relayed the data back to his employer. Police obtained this information in the immediate aftermath of the shooting. They traced the plate to a woman who turned out to be Betancourt's girlfriend. Betancourt eventually turned himself in and confessed to the crime, leading police to Gonzalez and Colon.

The other witness happened to be in a car parked at the curb near the place where Colon and Gonzalez smoked cigarettes and stalked potential victims. The witness was waiting for his mother to pick up a purchase at Macy's. Looking out the rear of his vehicle, he observed two men, fitting Gonzalez's and Betancourt's descriptions, following a woman as she walked away from the mall toward the parking lot. Although

he did not see the struggle and subsequent killing, he did recall hearing two "pops" immediately after observing them.

As events played out at trial, the evidence presented by these witnesses proved to be merely corroborative. Each defendant gave a full statement to police. In those statements, the defendants offered evidence from which a jury could easily conclude that each had agreed to commit a robbery and were, at the very least, accomplices in the crime in which Ms. D'Odoardo was killed.

Trial Court Opinion 5/16/2003, at 3–5. Colon and Gonzalez were convicted in a joint trial after Gonzalez's guilty plea was aborted. Colon raises the following issues for our review.

A. Did the lower court err by failing to sever the trials of the two co-defendants either pre-trial or after the aborted guilty plea of the co-defendant, Gonzalez?

B. Did the trial court err by admitting the redacted confession of the co-defendant, Gonzalez, during the joint trial?

C. Did the trial court err by failing to permit the use of the co-defendant's statement given during an aborted guilty plea from use at trial, which statements exculpated Colon?

D. Did the lower court err by failing to suppress the statements and confessions of Colon?

E. Did the lower court err by permitting the admission of testimony regarding the use of the murder weapon, a handgun, by the untried additional co-defendant in a robbery committed several weeks before the homicide?

Appellant's brief at 4–5. We take appellant's issues out of order for ease in setting

forth our rationale affirming the lower court's rulings.

¶ 2 In his second issue, appellant argues that the redacted statement of co-defendant Gonzalez was prejudicial to appellant and should not have been admitted into evidence. Additionally, it is alleged that admission of Gonzalez's statement when Gonzalez did not testify at trial violated appellant's right to confront his accuser. Gonzalez had provided police with a 94–page statement regarding the events leading up to the shooting of Ms. D'Odoardo.

¶ 3 In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the U.S. Supreme Court held that a defendant's Sixth Amendment right to confrontation is violated when a statement of a non-testifying co-defendant that clearly implicates the defendant is entered into evidence. As a result, courts have struggled with the issue of redacting from the non-testifying co-defendant's statement any wording that readily identifies the defendant who is contesting admission of the statement. In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the court held the statement of a co-defendant admissible because all reference to the complaining defendant had been redacted. The fact that the jury may have connected the complaining defendant with the statement by way of other evidence was not error. Finally, in *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), the court considered a statement of a co-defendant which replaced the defendant's name with the word "deleted." The court held that replacing the defendant's identity with the word "deleted," or with a "symbol or other obvious indication of alternation," *Id.* at 192, 118 S.Ct. 1151, was not sufficient to take the statement outside the scope of *Bruton.*

¶ 4 In 1977, the Pennsylvania Supreme Court held that admission of a properly redacted statement does not violate a defendant's right to confrontation. "If a confession can be edited so that it retains its narrative integrity and yet in no way refers to defendant, then use of it does not violate the principles of *Bruton.*" *Commonwealth v. Johnson,* 474 Pa. 410, 378 A.2d 859, 860 (1977). The court emphasized that a determination of the quality of the redactions must be made on a case-by-case basis with discretion in the trial judge. "[W]hen it is not clear that a confession can be redacted without prejudice to the defendant, the confession should be excluded." *Id.* at 861.

¶ 5 More recently our Supreme Court considered the question of whether one can substitute a pronoun for defendant's identity rather than using the word "deleted" or using a symbol. In *Commonwealth v. Travers,* 564 Pa. 362, 768 A.2d 845 (2001), the Supreme Court approved the use of the phrase "the other man" as a substitute for the defendant's name, noting that "the redacted statement could become incriminating only through independent evidence introduced at trial which established the defendant's complicity and, even then, only if it is assumed that the jury ignored the court's charge." *Id.* at 851. The court also stated that a trial court must give the jury a limiting instruction that the statement can only be used as evidence against the declarant and not the other defendants.

¶ 6 Finally, in *Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504 (2002), our Supreme Court again approved use of a redacted statement with a limiting instruction. Therein the court stated that

> when read together, *Bruton, Richardson,* and *Gray* stand for the notion that a statement of a non-testifying co-defendant, provided that the trial court gives

a limiting instruction to the jury admonishing them to consider the statement against solely the declarant, will violate the Confrontation Clause only when the jury can tell from the face of the statement to whom it is referring; if the jury must refer to other evidence to determine to whom the statement refers, the Confrontation Clause rights of the defendant are not violated.

*Id.* at 512.

¶ 7 In the case *sub judice,* counsel for the parties presented its suggested redactions to the trial judge the afternoon before the statement was read into evidence. We first note that we have reviewed co-defendant Gonzalez's statement and find that Gonzalez never referred to appellant by his given name. The examining officer and Gonzales repeatedly used terms such as "he and another person," "another person," "they," "someone else," "the other person," and "you guys." When the examining officer asked Gonzales if "the other person" had a nickname, Gonzales replied, "no." The statement given by Gonzales describes a conspiracy between three individuals. Gonzales occasionally refers to one of the other individuals as "Eliut" or "E," but Gonzales never specifically identifies appellant. The officer also asks Gonzales about other people with nicknames "Carlos" and "Pablito." We do not see how this statement, on its face, powerfully incriminates the appellant. The jury can only find that appellant was "the other person" through independent evidence. Nonetheless, the trial court did review the suggested redactions with counsel and the redacted statement was admitted without additional objection by the appellant. Furthermore, the trial judge provided the jury with an appropriate limiting instruction not once, but twice, once during his charge, and also immediately prior to the reading of Gonzalez's statement, at the request of appellant's counsel. Appellant has not demonstrated that he was prejudiced or that his right to confrontation was violated.

¶ 8 In his fifth numbered issue, appellant argues that the trial court erred by allowing testimony concerning use of the murder weapon in a shooting incident approximately two weeks before Mrs. D'Odoardo was killed. There is no evidence that appellant was involved in the earlier shooting. The Commonwealth has argued, and we agree, that appellant has waived his right to argue this issue. Procedurally, appellant's counsel made an oral motion *in limine* on the first day of trial to exclude this testimony. The motion was immediately denied. Counsel did not make an objection on the record to the court's ruling on the motion *in limine.* The trial judge indicated that he would provide the jury with the appropriate cautionary instruction regarding said testimony. Gonzalez's counsel acceded to the trial court's ruling and asked that the court provide the same limiting instruction when a second police officer also testified regarding the earlier shooting. Lastly, when the time came for the Commonwealth to call the police officers to the stand for examination on the earlier shooting, Gonzalez's counsel did not raise any objections.

¶ 9 This procedural history is virtually identical to the case of *Commonwealth v. Griffin,* 453 Pa.Super. 657, 684 A.2d 589 (1996). In *Griffin,* the Commonwealth sought to introduce testimony regarding the chain of custody of a gun. Defense counsel objected, but the trial court denied the objection and indicated that it would provide the jury with a cautionary instruction. Defense counsel acceded to the trial court's ruling and did not place an objection on the record when the testimony was offered to the court. On appellate review, this Court held that the defendant had

waived his right to raise the admissibility of the chain of custody of the gun on appeal. Finding the instant case analogous to *Griffin*, appellant has waived his right to argue this issue. For purposes of allowance of appeal, however, we do state for the record that if this issue had been properly preserved, we would not have found error in the trial court's ruling.

¶ 10 Admissibility of evidence is in the discretion of the trial court. *Commonwealth v. Travaglia*, 792 A.2d 1261, 1263 (Pa.Super.2002). The admissibility of evidence is determined by its relevance and probative value. *Commonwealth v. Lilliock*, 740 A.2d 237, 244 (Pa.Super.1999). Relevant and probative evidence is inadmissible if its probative value is outweighed by unfair prejudice. *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 402 (1994). This Court has previously stated that all evidence in a criminal proceeding is prejudicial to the defendant, *Commonwealth v. Kitchen*, 730 A.2d 513, 519 (Pa.Super.1999), and that relevant evidence is to be excluded only when it is "so prejudicial that it may inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Id.* (citations omitted).

¶ 11 In this case, the Commonwealth sought to introduce testimony that the gun used by appellant and his accomplices was used by accomplice Eliut Betancourt a few weeks earlier. The trial court found that the "testimony proved critical to the Commonwealth's need to establish [a] chain of custody of the alleged murder weapon." Trial Court Opinion, 5/16/2003 at 13. Two separate cautionary instructions were provided to the jury. The district attorney agreed that during his opening statement he would not use it to connect appellant to the prior shooting. The testimony regarding the prior shooting was probative of Betancourt's intend-

ed use of the gun at the Lehigh Valley Mall. Charged as a co-conspirator, Betancourt's intended use of the gun may be justly imputed to appellant. The judge's two cautionary instructions were appropriate to curb any prejudice. To hold otherwise would be to assume that the jury blatantly disregarded not only the two cautionary instructions, but also disregarded the trial court's final instructions to render a verdict after a review of *all* of the evidence. We do not find that the lower court abused its discretion in admitting this evidence.

¶ 12 In his first issue, appellant argues that the trial court should have ordered separate trials for appellant and co-defendant Gonzalez. Appellant's rationale is that admission of the redacted statement by Gonzalez, and admission of testimony of an earlier shooting with the murder weapon, was overly prejudicial to the appellant. We disagree.

¶ 13 A joint trial of co-defendants in an alleged conspiracy is preferred not only in this Commonwealth, but throughout the United States. *Commonwealth v. Travers*, 564 Pa. 362, 768 A.2d 845, 847 (2001).

> It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability.

*Id.* quoting *Richardson v. Marsh,* 481 U.S. at 209, 107 S.Ct. 1702. A defendant requesting a separate trial "must show real potential for prejudice rather than mere speculation." *Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 137 (2001). The defendant bears the burden of proof, and we will only reverse a decision not to sever if we find a manifest abuse of discretion by the trial court. *Id.*

¶ 14 In his brief, appellant argues that he was prejudiced in a joint trial due to the admission of Gonzalez's redacted statement and testimony of a prior shooting. For the reasons stated above, appellant was not prejudiced by this evidence. The trial judge was correct in holding that appellant's argument was not sufficient evidence of prejudice to overcome the preference for a joint trial. We affirm the trial court's ruling.

■ ¶ 15 In his third numbered issue, appellant argues that the trial court erred by excluding co-defendant Gonzalez's testimony at an aborted guilty plea proceeding. One month before trial, Gonzalez attempted to plead guilty to the charges. The plea was expressly conditioned on Gonzalez's agreement to testify against appellant at appellant's trial. Following a thorough review of Gonzalez's rights and his unwavering indication that he desired to enter a guilty plea, the court heard testimony from the investigating officer and Gonzalez. During his testimony, Gonzalez made several statements that conflicted with the statement he had previously provided to the police. Several attempts were made by the district attorney to elicit testimony from Gonzalez that was consistent with his earlier statement to the police; however, the district attorney ceased questioning when it became apparent to the district attorney that Gonzalez was not going to cooperate. The district attorney told the court, "[t]rial. I am not going to put up

with this nonsense. Trial. Either he tells us the truth at this juncture, or the deal is off the table." N.T. 9/18/2002 at 61–62. Gonzalez's attorney responded that Gonzalez was "providing the truth as he knows it . . ." *Id.* at 62, and that the testimony on the record was a sufficient acknowledgment of guilt for the plea. The district attorney countered that "as a specific condition of this plea agreement, this defendant agrees to testify truthfully in the matters against [appellant], and based on what he has told us earlier, he is not now testifying truthfully, in my opinion. Therefore, unless he does, I am going to withdraw the plea agreement." *Id.* at 63.

¶ 16 The trial judge indicated that he was not going to force the plea agreement and he provided the attorneys with time to discuss the situation before proceeding further. After a recess, the attorneys indicated to the judge that they were ready to resume testimony. During this course of testimony, Gonzalez became what we can only describe as coy based on our reading of the transcript. In his statement to police, and in portions of his earlier testimony, Gonzalez had stated that he and his two cohorts formalized a plan to commit a robbery on the evening that Ms. D'Odoardo was killed. When testimony resumed, however, Gonzalez began a game of semantics. The transcript reads as follows.

[D.A.]: but at some point that night, a plan developed that there would be a robbery that would be committed at the mall that night; correct, or not?

[Gonzalez]: Somebody wanted to make money, and I was guessing that was the robbery.

[D.A.]: You were guessing that it was a robbery?

[Gonzalez]: Yes, sir.

The Court: Well, can you repeat for me what occurred in the car on the way to the mall, and who said what?

[Gonzalez]: The discussion was Eliut said he wanted to make money.

The Court: And what did you understand that to mean?

[Gonzalez]: It could have meant several things, but it could have been a robbery. So I kind of understand that there was going to be a robbery.

The Court: So you understood—That's the way you interpreted Eliut's conversation. Eliut wanted to make money, and you concluded from that, you understood him to be talking about pulling a robbery; is that right?

[Gonzalez]: It could have been a possibility that he was talking about it.

The Court: Isn't that what you thought, or not?

[Gonzalez]: No.

The Court: What did you think?

[Gonzalez]: I thought we were going to the mall and he was going to meet somebody there.

N.T. at 69–70.

¶ 17 At this point the judge ordered a recess for several hours so that counsel could confer with his client. When testimony resumed that afternoon, Gonzalez's counsel took him step-by-step through the events as they occurred at the mall. The district attorney then questioned Gonzalez and specifically asked Gonzalez if he understood that as a part of the plea agreement, he would have to testify against appellant and Eliut Betancourt. Although that morning Gonzalez acknowledged that his plea was in exchange for testimony against appellant *and* Betancourt, Gonzalez was now contending that the district attorney told him that he only had to testify against Betancourt. Gonzalez's counsel intervened and advised Gonzalez

that the testimony would have to be against both co-defendants. When asked if he understood that, Gonzalez replied that he understood. Then, when asked by the district attorney if appellant was present during discussions planning the robbery, Gonzalez attempted to exculpate appellant by stating that appellant was not present during the discussion and that appellant later learned of the plan from Gonzalez. The district attorney immediately withdrew his offer to plead this case and the trial court agreed.

¶ 18 Appellant wanted the portion of the testimony that exculpated him admitted into evidence. The trial court did not permit the evidence. Appellant argues that the testimony was admissible as an exception to the hearsay rule because it constitutes former testimony by an unavailable declarant. Gonzalez invoked his Fifth Amendment right and did not testify at the trial. There is no question that Gonzalez's choice to not testify made him an unavailable declarant. The issue is whether the testimony given at the aborted plea proceedings qualifies as the type of former testimony embraced by Pennsylvania Rule of Evidence 804(b)(1). This is a matter of first impression in Pennsylvania.

¶ 19 Rule 804(b)(1) defines former testimony as

Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, *had an adequate opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.*

Pa.R.E. 804(b)(1) (emphasis added).

¶ 20 The trial court found that the Commonwealth did not have either an adequate

opportunity or a similar motive to develop the testimony of Gonzalez at the plea proceedings. As Judge Reibman eloquently stated:

> Unlike a trial, a plea-colloquy is not a truth-determining process. Indeed, as the events in the present case reveal, it is precisely at the point where the great instrument of revelation, cross-examination, proves its meddle that the plea-colloquy and the trial part ways. Often in the course of a plea colloquy, the prosecutor is desirous of hearing and observing a compliant and willing witness—one who will lend him assistance in a future prosecution. As soon as the defendant proves unwilling to reveal the truth as the prosecutor sees or wants it, the proceeding comes to a halt. This, however, is precisely the time that, were it a trial, that the prosecutor would muster all of his powers to expose the reluctant witness for the liar that he is. In the plea-colloquy, however, the prosecuting attorney does not cross examine—that would be contrary to his purpose to secure a cooperative witness—he simply withdraws the offer. Thus, while a previous trial will often prove an adequate proceeding to afford an exception under the [hearsay] rule, an aborted guilty-plea proceeding simply does not provide the requisite motivation nor opportunity to develop the prior testimony.

Trial Court Opinion 5/16/2003 at 7–8. We find Judge Reibman's analysis consistent with other jurisdictions and learned treatises. In *Dudley v. U.S.*, 715 A.2d 866 (D.C.1998), the prosecutor agreed to defendant Smith's guilty plea on reduced charges in exchange for her statement connecting Dudley to the crime. At the plea proceedings, Smith testified under oath that Dudley had no involvement in the crime. The prosecution immediately ceased questioning and advised the court that it was no longer offering the plea.

Smith later pleaded guilty to all charges and the case against Dudley went to trial. Smith did not appear and Dudley's counsel attempted to introduce Smith's statement from the aborted guilty plea into evidence as former testimony by an unavailable declarant. The trial court did not allow the testimony. On appeal, the District of Columbia Court of Appeals held that the prosecutor did not have an adequate opportunity to examine Smith at the plea proceeding because the issue at the plea proceeding and the issue at Dudley's trial were not substantially similar. In the plea proceeding, "Dudley's guilty or innocence was thus at issue only in a narrow sense: if Smith satisfied the prosecutor in linking Dudley to the sale [of drugs] (or at least in not exculpating him), her plea could proceed, otherwise, it could not. The prosecutor's questioning of Smith was therefore very limited." *Id.* at 867–68. The Court of Appeals held that the issue of Dudley's guilt or innocence ended when Smith made her exculpating statements and with that ended the prosecution's right to continue questioning on the issue.

¶ 21 We also find instructive the opinions of Professors Lilly and McCormick. The opportunity to examine the declarant during the former testimony must have been meaningful *in light of the circumstances at the time of the prior examination.* *McCormick on Evidence* § 302, at 456 (5th ed.1999) (emphasis added). Additionally, similar motive to cross-examine is "determined by ascertaining the interests and objectives of the party in the first proceeding." Lilly, *An Introduction on the Law of Evidence* § 7.23, at 329 (3rd ed.1996).

¶ 22 In the case *sub judice*, Gonzalez's guilty plea was expressly conditioned on his testifying against appellant at the subsequent trial. The district attorney had two motives in examining Gonzalez—to

have Gonzalez place on the record a sufficient acknowledgment of guilt to sustain his plea and to have Gonzalez place on the record the truthful testimony he would provide for the Commonwealth and against appellant during appellant's trial. The plea proceedings, however, turned into an attempt by Gonzalez to enter his plea while simultaneously exculpating his partner in crime. The testimony given at the plea proceedings was contradictory, not only in itself, but also with Gonzalez's prior statement to police. The district attorney made several attempts to elicit truthful testimony from Gonzalez and Gonzalez made it apparent that he did not intend to cooperate. The district attorney had every right to withdraw his offer to accept a guilty plea in this case and, when he did, the district attorney lost his opportunity to continue examination of Gonzalez. Even if examination had continued, the motive for examination at the plea proceedings was not to cross-examine Gonzalez and establish him as a liar. That motive was reserved for examination of Gonzalez had he been a witness *against* the Commonwealth. At the plea proceedings, Gonzalez's testimony was being developed solely as a witness *for* the Commonwealth. The district attorney was relying on Gonzalez as a prosecution witness against appellant. Finding that the district attorney did not have a similar motive in the examination of Gonzalez, thus rendering him with an *in* adequate opportunity to examine Gonzalez, we affirm the trial court's ruling that Gonzalez's aborted guilty-plea testimony was not admissible under Pa.R.E. 804(b)(1).

■ ¶ 23 Appellant has argued that, alternatively, the testimony should have been admitted pursuant to Pa.R.E. 804(b)(3). That rule permits hearsay testimony to be admitted if the statement is against the declarant's interest. Our Supreme Court has held that a confession which exculpates a declarant's accomplices is not a statement against interest because it does not subject the declarant to any additional crime or punishment. *Commonwealth v. Colon*, 461 Pa. 577, 337 A.2d 554, 558 (1975). Furthermore, before a hearsay statement can be admitted under Rule 804(b)(3), it must be shown that the statement was made "under circumstances that provide considerable assurance of their reliability ..." *Commonwealth v. Ayala*, 277 Pa.Super. 363, 419 A.2d 1187, 1189 (1980). A statement that exculpates an accomplice, however, "does not have the safeguards of trustworthiness attributed to a statement truly against interest." *Colon*, 337 A.2d at 558. Hence, Gonzalez's statement that exculpated appellant from the crimes charged would not be admissible as a statement against interest.

■ ¶ 24 Finally, in his fourth issue, appellant argues that the trial court should have suppressed the statement appellant gave to police as a violation of his right to counsel. It has long been held that a person must be advised of his or her constitutional right to counsel prior to a custodial interrogation by police. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A person may validly waive his or her right to counsel if that waiver is made voluntarily, knowingly, and intelligently. *Commonwealth v. Waggoner*, 373 Pa.Super. 23, 540 A.2d 280, 289 (1988). A problem arises, however, when the person makes an ambiguous statement concerning his or her right to counsel. This Court has stated that when the defendant has made an ambiguous statement regarding his right, the police "should ask questions to clarify what the defendant meant by his statement or why he made it." *Id.* Furthermore, a distinction has been made between ambiguity during a *Miranda* colloquy and statements made to reinvoke the right to

counsel. *Id.* at 287. As the trial court properly noted in its assessment of appellant's request for suppression, a suggestion by the defendant that he may be reinvoking his right to counsel may require the police to provide another *Miranda* warning. A court's review of the interrogation conducted after a valid *Miranda* waiver, and whether statements by the defendant required a second *Miranda* warning, is based on the totality of the circumstances.

¶ 25 In the instant case, appellant was administered his *Miranda* warnings and there is no dispute that appellant initially waived his right to counsel. The issue in this case arose during the interrogation. Appellant cites the following exchange of dialogue as his point of contention for suppression of the entire statement.

Appellant: I know I'm in, I know I'm in some deep shit.

Officer: I, I'm sorry, I can't hear you.

Appellant: I know I'm in some deep shit.

Officer: Well, certainly.

Appellant: *If, if a lawyer, I ask for a lawyer, will he come here or I gotta wait?*

Officer: Oh, sure.

Appellant: (unintelligible) . . . okay.

\* \* \*

Officer: I can't tell you what to do, nor would I ever, okay? I will tell you that the other people we spoke to, okay, who's [sic] names are on the same paper you're getting, and I will tell you this, and I'm not trying to influence you, but I'm telling you, we spoke to them here at the Whitehall Police Department, and the only lawyers that were present were from the District Attorney's Office. They felt they wanted to talk to us, get it off

their chest I guess and tell us what happened. Franklin, we know what happened, but we have to hear it from you, okay? You know that, and I know that.

We begin by noting that appellant has omitted an important part of the dialogue. Following appellant's unintelligible response, the officer asked appellant if he would like to make a phone call. Appellant made an inaudible response that was then followed by the officer's statement that he would not try to influence appellant's decision, but that the other defendants had chosen to speak to police without representation of counsel.

¶ 26 Appellant is arguing that his statement, emphasized above, was ambiguous as to his understanding of his right to counsel, and that officers should have asked clarifying questions before proceeding with interrogation. Appellant relies on *Waggoner* for this proposition. *Waggoner* involved an ambiguous statement made by the defendant during the *Miranda* colloquy. In this case, the officers had completed the *Miranda* colloquy, appellant had validly waived his right to counsel, and interrogation had begun before appellant made the allegedly ambiguous statement. The trial court found this distinction as important as we find it. We quote, with approval, the trial court's analysis.

[T]he present case differs from *Waggoner* in two critical ways. First, unlike *Waggoner*, here the alleged ambiguous response did not arise in the course of the *Miranda* colloquy itself. Therefore, the burden has not shifted to the Commonwealth to prove the legitimacy of the waiver. Instead, whether [appellant] invoked the right to counsel or was otherwise entitled to a reiteration [of] the *Miranda* warning must be evaluated under the "totality of the circumstances." The police had already explained to [ap-

pellant] his rights and he had already voluntarily, knowingly, and intelligently given them up, as evidenced by his signing of a written waiver. [Commonwealth's Exhibit 2 in opposition to motion to suppress]. Thus, the above-cited question does not rise to an equivocation in the waiver of *Miranda* rights, but instead, and at most, constitutes a revisitation on the part of [appellant] as to his particular options. [Appellant] does not contend nor would it be plausible that this amounted to the invocation of a right to counsel after waiver. And given the "totality of the circumstances"—including specifically [appellant's] signed waiver, the proximity in time between the waiver and the subsequent questioning, and [appellant's] demeanor as exhibited on the videotaped interrogation—no re-warning pursuant to *Miranda* was compelled.

Second, unlike the police in *Waggoner*, here [the officer] did not simply ignore [appellant's] comments. Instead, he followed up on them, explaining that should [appellant] ask for a lawyer, one would be provided immediately and that it was not his, the detective's place, to advise [appellant] on what course to undertake. These facts, therefore, cannot be said to be in harmony with those existing in *Waggoner*. Thus, even assuming *arguendo* that ... an ambiguity has been presented under *Waggoner*'s reasoning, thereby compelling a burden to shift to the Commonwealth, the latter has met its burden. [The officer's] explanation suffices to demonstrate by a preponderance of the evidence that [appellant's] subsequent statements were made in voluntary, knowing, and intelligent waiver of his *Miranda* rights.

Trial Court Opinion, 9/11/2002, at 12–13.

¶ 27 Upon review of the record and case law, we find the trial court's analysis cor-

rect and affirm the order denying suppression of appellant's statement.

¶ 28 Judgment of sentence AFFIRMED.