J-A26017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                                       :                    PENNSYLVANIA
                                                       :
                          v.                           :
                                                       :
                                                       :
                                                       :
GARY GODDARD                            :
                                                       :
                  Appellant             :   No. 2097 EDA 2019

Appeal from the Judgment of Sentence Entered June 13, 2019
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0004365-2018

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                       **FILED DECEMBER 28, 2020**

Gary Goddard appeals from the judgment of sentence, entered in the

Court of Common Pleas of Bucks County, following his convictions by a jury of

criminal attempt to commit homicide,[1] discharge of a firearm into an occupied

structure,[2] recklessly endangering another person (REAP),[3] and possessing an

instrument of crime (PIC).[4]

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 901.

[2] 18 Pa.C.S.A. § 2707.1(a).

[3] 18 Pa.C.S.A. § 2705.

[4] 18 Pa.C.S.A. § 907(a).

Goddard's convictions stem from his role in multiple shootings that occurred at a gathering hosted outside April Coleman's home, located at 914 Elmhurst Avenue, in Bristol, Pennsylvania, on May 4, 2018, which resulted in the deaths of Zyisean McDuffie and Tommy Ballard. On that date, Coleman hosted a party for her two children, who planned to attend their high school prom later that evening. Several family friends were present including Joseph Williams,[5] Gary Goddard, Jr.,[6] Tajon Skelton, Rayshaun James, and Sincere McNeil. These individuals were all gathered around April Coleman's Chrysler Pacifica, which was parked on her front lawn area.

At one point, McDuffie arrived at the Coleman residence, approached the group at the Chrysler Pacifica, and shook hands only with Williams. Williams then asked why McDuffie did not acknowledge the others, at which point McDuffie stated that he "didn't mess with none of [them]" and called them all "bitch." N.T. Jury Trial, 3/12/19, at 190. At the end of the verbal confrontation, McDuffie left, stating he would return soon.

When McDuffie returned about forty-five minutes to an hour later, he arrived with Ballard, Jahmier Wilson, and Jackie Valentine; Williams and Wilson then walked away together to have a private conversation. Within the

---

[5] Joseph Williams is Goddard's co-defendant, and was charged separately in connection with the same shooting incident. We consider Williams' appeal separately at **Commonwealth v. Williams**, 1824 EDA 2019.

[6] At trial, Gary Nathaniel Goddard, Jr., was sometimes referred to as "Static" or "Little Gary." For clarity, we refer to him exclusively as "Goddard, Jr." Goddard, Jr., is Goddard's son.

larger group, still standing around the Chrysler Pacifica, an argument ensued amongst Goddard, Jr., McNeil, McDuffie and Ballard. McDuffie punched Goddard, Jr., in the face, and within moments, Williams removed the firearm from his waistband and began firing it at Wilson, who was running away from him. N.T. Jury Trial, 3/15/19, at 110-114; N.T. Jury Trial, 3/18/19, at 170-73. Although Williams fired repeatedly at Wilson, Wilson was not injured, but McDuffie and Ballard were struck. Ballard collapsed in the front yard of 911 Elmhurst Avenue and McDuffie was struck but still standing in the driveway of 916 Elmhurst Avenue.

Goddard then appeared, walking down Weston Avenue, with his hand raised and wielding a firearm. N.T. Jury Trial, 3/13/19, at 281-84; N.T. Jury Trial, 3/15/19, at 120-22. Standing in front of 916 Elmhurst Avenue, Goddard fired in the direction of the homes, and then at McDuffie, whose legs gave out from under him after the shots were fired. N.T. Jury Trial, 3/15/19, at 122; N.T. Jury Trial, 3/18/19, at 67-68. April Coleman observed Goddard discharge his weapon at her home, heard glass breaking, and then said to him, "Are you fucking kidding me[?]" N.T. Jury Trial, 3/15/19, at 123-24. Goddard looked at her, but did not reply. Goddard then stood over McDuffie, who was lying on the ground, and discharged his firearm, lodging a bullet in McDuffie's head just above the hairline. N.T. Jury Trial, 3/13/19, at 288; N.T. Jury Trial, 3/18/19, at 117-22, 226-29.

Other testimony revealed that Goddard, Jr., chased Wilson from the scene of the shooting, gun in hand and pointed forward with his arm fully

- 3 -

extended. *See* N.T. Jury Trial, 3/15/19, at 38-41; *see also* N.T. Jury Trial, 3/18/19, at 223-25. Goddard then told Goddard, Jr., to "Come on, let's go. Give me the gun, Static." N.T. Jury Trial, 3/15/19, at 43. Goddard, Jr., approached Goddard, and the two ran off together back towards Weston Avenue. *Id.* at 45, 127.

When police arrived at the scene, Officer Michael Sarciewicz first found Ballard, who was still able to talk and move, lying in the grass at 911 Elmhurst Avenue. A crowd then directed the officer to McDuffie, who was unresponsive, located in front of 916 Elmhurst Avenue. The officer observed bleeding and several gunshot wounds on McDuffie, and commenced cardiopulmonary resuscitation (CPR). McDuffie and Ballard were both transported to Frankford-Torresdale Hospital, where McDuffie was pronounced dead on arrival, and Ballard was pronounced dead shortly after arrival.

Doctor Zhonghue Hua conducted McDuffie's autopsy. McDuffie was nineteen years old and suffered five gunshot wounds, including one each to his forehead above the hairline, his left upper back, his right flank, his right kneecap, and a graze wound to his right upper chest. Doctor Hua determined the fatal injury was the gunshot wound to his right flank, which punctured his kidney. N.T. Jury Trial, 3/11/19, at 193-94. Intact bullets were removed from McDuffie's kneecap, head, and abdomen, and were turned over to investigators. Doctor Hua concluded McDuffie was still alive at the time he was shot in the head due to evidence of brain bleeding, that the cause of death

was multiple gunshot wounds, and that the manner of death was homicide. *Id.* at 215.

Police additionally removed two bullets from 914 Elmhurst Avenue—one was lodged in the siding of the residence; the other entered a window, proceeded through the kitchen, through a box of cereal, and into the wall before striking a flue and falling onto the utility room floor. **See** N.T. Jury Trial, 3/6/19, at 212-23, 227. Eric Nelson, of the Montgomery County Detectives,[7] conducted a forensic examination of all the recovered bullets. The bullet recovered from the utility room floor and the one recovered from McDuffie's skull were discharged from a .32 H&R revolver found by police in Goddard's apartment. The fatal bullet recovered from McDuffie's abdominal wall was shot from the .38 Rossi Special firearm, which was recovered from a grill behind 703 Winder Drive.[8] The other bullets recovered from McDuffie's

---

[7] Detective Nelson explained that, although he works for the Montgomery County Detectives, he often does work for the "surrounding counties," including Bucks County. **See** N.T. Jury Trial, 3/13/19, at 213.

[8] In the course of investigation, police officers reviewed video footage from pole cameras near the scene of the shooting. In the footage, police observed Williams, James, and Skelton run away from the shooting and enter the backyard of 703 Winder Drive, remain off-camera for one minute and thirty seconds while in the yard, and reemerge on camera travelling further down Winder Drive. The footage of Williams running shows his hands located around his belt area prior to entering the rear yard of 703 Winder Drive, but after leaving, his hands were no longer in his belt area. Police were dispatched to that address, where the owner of the property consented to a search. Police noticed a grill, which was completely covered in dirt and grime, except for the left handle. After searching the grill, police recovered a Rossi .38 Special revolver sticking out of the back near the propane tank. Skelton confirmed

right knee and the siding of 914 Elmhurst Avenue were not traced to a known firearm, but were revealed to have been fired from a firearm similar to a .38 revolver or .9 mm pistol. *See* N.T. Jury Trial, 3/13/19, at 232-39.

Several days after the shooting, on May 8, 2019, police stopped Goddard and Goddard, Jr. in Croydon, Bucks County, in a silver GMC Envoy. N.T. Jury Trial, 3/13/19, at 79-80. The vehicle was registered to Taddia Hamilton, Goddard's sister, who lived in Irvington, New Jersey. N.T. Jury Trial, 3/13/19, at 153-54. Police discovered Goddard's 2004 GMC Yukon in the vicinity of Hamilton's residence in New Jersey. N.T. Jury Trial, 3/13/19, at 160-66. Police searched Goddard's apartment and discovered a large variety of lawfully-owned firearms, including a .32 H&R revolver, and a large supply of ammunition. *Id.* at 126.

Police also sought Goddard's historical cell site data. The data revealed two incoming calls on May 4, 2018 at 7:16 and 7:17 p.m., and showed the phone's location to be in Bristol Township, Bucks County. Two more calls occurred at 7:38 and 7:39 p.m., revealing the phone was in New Jersey. N.T. Jury Trial, 3/11/19, at 267-68. Police discovered the phone was then transported into the Brooklyn/Long Island area of New York City at approximately 9:35 p.m. that same day. *Id.* at 259-73. The next day, the phone traveled to Irvington, New Jersey at approximately 2:20 p.m., where it

___

through testimony at trial that Williams was the only one who approached the grill when the three individuals were in the rear yard of 703 Winder Drive. *See* N.T. Jury Trial, 3/8/19, at 171-73.

remained until it returned to the Philadelphia area on May 7, 2018. *Id.* at 275; N.T. Jury Trial, 3/12/19, at 11-12, 17-21. While Goddard's phone was in Irvington, New Jersey, Goddard, Jr.'s phone remained in the New York City area, until it, too, returned to the Philadelphia area on May 7, 2018. N.T. Jury Trial, 3/12/19, at 17-21.

Police searched Goddard's phone and found numerous internet searches conducted in the days following the shootings, including queries regarding: self-defense; law enforcement's capabilities in unlocking cellular phones, including unlocking them remotely; Pennsylvania Stand Your Ground law; and searches related to George Zimmerman. N.T. Jury Trial, 3/19/19, at 129-32.

On May 6, 2018, the Commonwealth charged Goddard with various crimes relating to the shooting incident. On July 18, 2018, at the preliminary hearing, the court permitted the Commonwealth to amend the charges, and held all charges for court, docketing the case at docket number 4365-2018. On August 14, 2018, the Commonwealth filed a criminal information reflecting the amendments.[9]

On March 4, 2019, the court held a hearing prior to the commencement of trial to resolve outstanding pretrial matters. At that hearing, the court

---

[9] The information charged Goddard as follows: Count 1 – criminal attempt to commit criminal homicide; Count 2 – aggravated assault; Count 3 – discharge of a firearm into an occupied structure; Count 4 – PIC; Count 5 – possession of weapon; and Count 6 – REAP.

granted the Commonwealth's motion to consolidate Goddard's case with the two cases against Joseph Williams.

A joint jury trial commenced on March 4, 2019, and concluded on March 22, 2019. Goddard testified in his own defense. *See* N.T. Jury Trial, 3/19/19, at 201-314; N.T. Jury Trial, 3/20/19, at 5-113.

Goddard testified that he was at his brother's residence on Weston Avenue, down the street from where the shooting occurred, when he heard the first shots. Upon hearing the shooting, Goddard decided to run to his vehicle to retrieve his firearm, and then proceeded to the location of where he heard the shots. On arriving at the scene, Goddard saw his son on the ground with blood all over him, with an unknown individual—later identified as McDuffie—on top of him. Goddard ordered McDuffie off Goddard, Jr., and shot McDuffie twice when he failed to comply. Goddard testified that he shot McDuffie when he was still on top of Goddard, Jr. N.T. Jury Trial, 3/20/19, at 62. Goddard explained neither how the bullet entered the front of McDuffie's head if he was shot from behind, nor how a bullet fired from his weapon entered Coleman's home. *Id.* at 62-63, 103-04. Goddard further testified that his trip to New York was pre-planned, as demonstrated by the advance notice to, and receipt of permission from, Goddard, Jr.'s, probation officer. Goddard also clarified that he is a licensed gun owner and frequently went shooting at a local gun range. He also testified that at one point Goddard, Jr., took one of his weapons without permission, and Goddard promptly reported that incident to police. He testified further that, because of various incidents

that occurred between his son and Wilson, as well as his observations of a verbal altercation that occurred during a basketball game, Goddard was concerned about possible violent retribution against Goddard, Jr. N.T. Jury Trial, 3/19/19, at 242-52. During the trial, the court granted the Commonwealth's motion to *nolle prosequi* the charges of aggravated assault and possession of a weapon. At the close of deliberations, the jury convicted Goddard of the above-stated offenses.

On June 13, 2019, the court sentenced Goddard on Count 1 (criminal attempt to commit homicide) to 9 to 18 years' incarceration; on Count 3 (discharge of a firearm into an occupied structure) to 3½ to 7 years' incarceration, to be served consecutively to the sentence on Count 1; and to no additional penalty for REAP and PIC.

On June 19, 2019, Goddard filed a post-sentence motion, which the court denied on June 24, 2019. On July 20, 2019, Goddard filed a timely notice of appeal. The court appointed Goddard new appellate counsel on July 23, 2019, and ordered Goddard to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After several extensions, counsel filed the Rule 1925(b) statement on February 12, 2020, and the court then filed a joint opinion as to both Goddard's and Williams' appeals on March 3, 2020.

On appeal, Goddard presents the following issues for our review:

1. Did the [t]rial [c]ourt commit an abuse of discretion when it failed to hold separate trials for [Goddard] and [Williams,] [] when much of the testimony regarding [Williams'] actions[,] as

well as highly prejudicial letters and music[,] would not have been permitted in a case against Goddard as a sole defendant?

2. Did the [t]rial [c]ourt err in imposing consecutive sentences, both in the aggravated range of the guidelines, despite the fact[s] that [Goddard] had no prior record and that he acted in the heat of the moment without significant premeditation?

Appellant's Brief, at 6.

Goddard first claims he is entitled to a new trial because the court abused its discretion when it granted the Commonwealth's motion to consolidate his case with the two cases against his co-defendant, Williams. Specifically, Goddard notes that evidence that was only arguably admissible against Williams was certainly not admissible against himself—including the introduction of a letter, a shirt, and a song, tending to prove Williams' identity as Ballard's and McDuffie's murderer. Goddard contends that the racially-charged language in the letter and the song, repeated use of racial slurs and the term "savage," and references to murder unfairly prejudiced him in the eyes of the jury. Goddard supports his claim of unfair prejudice by noting: the Commonwealth did not allege or charge a conspiracy between Williams and himself; their actions were wholly unrelated; and, Williams was charged with being a person not to possess a firearm,[10] whereas Goddard was a lawful gun owner.

We review a trial court's decision to consolidate separate indictments under an abuse of discretion standard. *Commonwealth v. Collins*, 703 A.2d 418, 422 (Pa. 1997). "Whether or not separate indictments should be

_____

[10] 18 Pa.C.S.A. § 6105.

- 10 -

consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." ***Commonwealth v. Robinson***, 864 A.2d 460, 481 (Pa. 2004).

Pennsylvania Rule of Criminal Procedure 582 governs when the trial court may join informations and try them together, and states:

> **(1)** Offenses charged in separate indictments or informations may be tried together if:
>
>> **(a)** the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
>>
>> **(b)** the offenses charged are based on the same act or transaction.
>
> **(2)** Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Pa.R.Crim.P. 582(A). Conversely, Pennsylvania Rule of Criminal Procedure 583 governs when the trial court may sever informations and try them separately, and states: "The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.

In ***Commonwealth v. Lark***, 543 A.2d 491 (Pa. 1988), our Supreme Court set forth a three-part test explaining how trial courts should evaluate a motion to sever or a motion opposing joinder:

- 11 -

> Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: (1) whether the evidence of each of the offenses would be admissible in a separate trial for the other; (2) whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, (3) whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Id.* at 496-97.

A defendant requesting a separate trial "must show real potential for prejudice rather than mere speculation." *Commonwealth v. Rivera*, 773 A.2d 131, 137 (Pa. 2001). "This determination is left to the discretion of the court[,] which balances the inconvenience and expense to the government of separate trials against prejudice to the defendants in a joint trial, and the burden is on the movant to show prejudice." *Commonwealth v. Lambert*, 603 A.2d 568, 573 (Pa. 1992).

With regard to hostility between co-defendants, and conflicting versions of events as described between co-defendants, the Court has further explained that

> the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for[,] rather than against[,] a joint trial because the truth may be more easily determined if all are tried together. Instead, severance should be granted only where the defenses are so antagonistic that they are irreconcilable—i.e., the jury essentially would be forced to disbelieve the testimony on behalf of one defendant in order to believe the defense of his co-defendant.

*Commonwealth v. Brown*, 925 A.2d 147, 161-62 (Pa. 2007) (internal citations and quotation marks omitted). "The general policy of the law is to

encourage joinder of offenses and consolidation of indictments when judicial economy can thereby be effected, especially when the result will be to avoid the expensive and time-consuming duplication of evidence." ***Commonwealth v. Patterson***, 546 A.2d 596, 600 (Pa. 1988).

In **Patterson**, our Supreme Court agreed with the trial court's decision to deny severance even though the charges against the Appellee and his co-defendant arose out of separate incidents, and evidence against the co-defendant would not have been admissible against the Appellee had they been tried separately. ***Id.*** at 601. The Supreme Court's ruling reversed this Court's ruling, and reinstated the trial court's decision favoring joinder, reasoning that: the trial was likely to be lengthy (five days), there existed an unnecessary burden on the young victim in having to testify in two separate lengthy trials, the court's curative cautionary instructions dispelled any prejudicial effect on the Appellee from the introduction of evidence relating to his co-defendant, and the evidence pertaining to the co-defendant's charge unmistakably and unequivocally pointed to the co-defendant only. ***Id.***

Here, we find the circumstances are substantially the same as those in **Patterson**. We note that Goddard's and Williams' joint trial lasted 15 days. Over that lengthy trial, thirty witnesses testified. Certainly, the vast majority of those witnesses would have been required for both trials against Williams and Goddard, had severance been permitted, due to the close temporal proximity of their criminal acts and the fact that they both shot the same victim. Moreover, many witnesses stated that they were not testifying

voluntarily, some out of fear of retaliation. *See* N.T. Pre-Trial Hearing, 3/4/19, at 63-64, 66-68; N.T. Jury Trial, 3/8/19, at 18, 97, 168-73, 195-97, 202-04; N.T. Jury Trial, 3/12/19, at 229-40, 290-94; N.T. Jury Trial, 3/13/19, at 11-16, 38-39, 46-47, 57-59; N.T. Jury Trial; 3/14/19, at 200, 234-36, 242; N.T. Jury Trial, 3/18/19, at 49-50, 53, 181-82, 236-37, 266-68. Further, we find that the court's clear instructions dispelled any prejudicial effect on Goddard from the introduction of evidence relating to Williams,[11] and that the

_____

[11] The court cautioned the jury as follows:

> I want to address another matter with you. Yesterday we had Detective Frank Groome testify as a witness[. P]rior to his testimony you saw some evidence, a red T-shirt. Detective Groome highlighted the fact that [t]his T-shirt, which was found in a trash can, allegedly had a specific unique type of silkscreen logo on the front. You were made aware of that, and we also saw it as an exhibit.

> There was a letter that was written **by this** [d]**efendant, Joseph Williams**, and of that there is no dispute. You can accept that. And it has on it what appears to be a handwritten logo similar to the logo that is silkscreened on the T-shirt. Whether it is or not is a fact for you, but that's my view of why the Commonwealth sought to introduce it. I believe, and they will argue if they choose, that **that somehow establishes the identity of the owner of the T-shirt to Joseph Williams. But again, it's for you to determine if that has been proven, and if, in fact, it is an important issue.** In the end, what is important is a decision for you and you alone. You determine the weight to be given any evidence, and I'll discuss that with you at the end of the case.

> Having said that, in that letter there was a reference to a rap song. The Commonwealth will argue that **this again establishes the identity of the writer of the letter and is connected to the T-shirt,** but again, I'm not saying it's so; only what I believe the

evidence against Williams and Goddard was clearly separable. *See Patterson*, *supra*; *see also Lark*, *supra*. The jury was never placed in the impossible position of disbelieving the testimony on behalf of either Goddard or Williams in order to believe the defense of the other. *See Brown*, *supra*.

_____

Commonwealth will argue. I permitted the playing of this rap song for you, and the Commonwealth provided two pages of lyrics for that song. Now, it is nothing more than a rap song, and I would not want you to think that it had any special value or evidentiary importance in and of itself. **It is clear that** [**Williams**] **did not write this song. He only referred to it in a letter, which apparently bears the same logo as the T-shirt.**

I'll be candid with all of you. We are all adults. This song is somewhat graphic in some measure, but it has no implications whatsoever as to the ultimate issue in this case, which is, has the Commonwealth proven beyond a reasonable doubt each and every element of every crime charged as against [] Joseph Williams, and [] Gary Goddard. The song, without more, is just one of many pieces of evidence you'll consider, but it has a limited purpose, and I didn't want you to draw the inference that this song proves anything. It certainly does not stand alone, just a part and parcel of[,] and it absolutely does not implicate, in any fashion, in any of these crimes, either Mr. Williams or Mr. Goddard, and I would not want you to think that it did.

So having told you that, it is only offered for a limited purpose. In the end, whether or not it has evidentiary value for you will be determined, but I can tell you now, and I can't stress it enough, **Mr. Williams did not write this song.** No one is suggesting he endorses any of the things said in the lyrics, and it absolutely has no bearing whatsoever on whether or not he is guilty of all, any, or none of these crimes. I just wanted you to know that.

N.T. Jury Trial, 3/19/19, at 11-14 (emphasis added). We note the court's off-hand references to Goddard were made within the context of the trial generally, and did not associate Goddard with, or connect Goddard to, Williams' letter, the t-shirt, or the song, which were all admitted to prove Williams' identity as Ballard and McDuffie's murderer.

Moreover, that the Commonwealth did not allege or charge a conspiracy between Williams and Goddard, and that their actions and motivations were distinct at the scene of the shootings, is of no moment. **See** Appellant's Brief, at 24-25. Indeed, this is the rare case where co-defendants tried by joint-trial are not charged with conspiracy; nevertheless, no such charge is required for joinder. **See** Pa.R.Crim.P. 582(A)(2).

Additionally, evidence of other crimes may be admissible in the context of joining separate indictments. **See Collins**, **supra** at 423 (evidence of other crimes admissible in joint trial if demonstrative of: (1) motive; (2) intent; (3) absence of mistake; (4) common scheme, plan, or design; (5) identity; or (6) where such evidence is part of history of case and forms natural development of facts.). The evidence tending to show Williams' guilt formed the history of Goddard's case, was part of the natural development of the facts, and helped to prove each shooter's relative culpability; indeed, without evidence of Williams' fatal shots, Goddard might have been charged and convicted of murder, rather than with only an attempt.

Also, the evidence tending to show that Williams unlawfully obtained his firearm was kept distinct from the evidence introduced against Goddard. Not only did the Commonwealth agree that Goddard obtained his firearms legally, **see** N.T. Jury Trial, 3/11/19, at 125-30; N.T. Jury Trial, 3/19/19, at 63-65, 214-29, but also, the court severed Williams' charge of person not to possess, and ultimately permitted the Commonwealth to withdraw it. Therefore, the jury was never aware of that charge.

We find the trial court did not abuse its discretion when it determined Goddard suffered no unfair prejudice under these circumstances. *See Lambert*, *supra*. Consequently, there was no abuse of discretion in the trial court's joinder of the Commonwealth's cases against Goddard and Williams. *See Lark*, *supra*; *Collins*, *supra* at 422. *See also Commonwealth v. Colon*, 846 A.2d 747, 753 (Pa. Super 2004) ("It would impair both the efficiency and the fairness of the criminal justice system to require that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability.") (ellipsis omitted).

In his second issue on appeal, Goddard raises a challenge to the discretionary aspects of his sentence. We note that the right to appeal the discretionary aspects of one's sentence is not absolute; the jurisdiction of this Court must be invoked, which we evaluate via the following four-part test:

> (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, *see* Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. The determination of whether a particular issue raises a substantial question is to be evaluated on a case-by-case basis. Generally, however, in order

- 17 -

to establish a substantial question, the appellant must show actions by the sentencing court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

***Commonwealth v. Dunphy***, 20 A.3d 1215, 1220-21 (Pa. Super. 2011) (some internal citations, quotations marks, and footnotes omitted).

Here, Goddard filed a post-sentence motion for reconsideration of his sentence, followed by a timely notice of appeal to this Court. He has also included in his brief a concise statement of reasons relied upon for allowance of appeal with respect to the discretionary aspects of his sentence pursuant to Rule 2119(f). ***See*** Appellant's Brief, at 19. Accordingly, we must now determine whether Goddard has raised a substantial question that his sentence is not appropriate under the Sentencing Code.

We determine whether the appellant has raised a substantial question on a case-by-case basis. ***Commonwealth v. Paul***, 925 A.2d 825, 828 (Pa. Super. 2007). "We cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists." ***Commonwealth v. Radecki***, 180 A.3d 441, 468 (Pa. Super. 2018) (brackets omitted).

In his Rule 2119(f) statement, Goddard states that: "The guidelines for sentencing are meant as a guidepost to the [c]ourt rather than as a series of required numbers that must be applied consecutively"; "[t]he [c]ourt has discretion to deviate from the guidelines to promote justice, but the [c]ourt may not sentence Appellant for crimes for which he was not convicted;" and, "[t]he [t]rial [c]ourt's imposition of consecutive sentences in the aggravated

range of the sentencing guidelines was prejudicial on its face in that the [c]ourt obviously believed [Goddard] had fled the scene despite testimony to the contrary." Appellant's Brief, at 19.

Standing alone, Goddard's Rule 2119(f) statement fails to raise a substantial question. *See Commonwealth v. Caldwell*, 117 A.3d 763, 769 (Pa. Super. 2015) (en banc) ("A court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question."); *Commonwealth v. Dodge*, 77 A.3d 1263, 1271 (Pa. Super. 2013) ("We caution defendants that a simple citation to *Mouzon*, *Dodge II*, or another case may not be sufficient where the facts of the case do not warrant the conclusion that there is a plausible argument that the sentence is *prima facie* excessive based on the criminal conduct involved."); *see also Commonwealth v. Fisher*, 47 A.3d 155, 159 (Pa. Super. 2012) ("[A] bald assertion that a sentence is excessive does not by itself raise a substantial question justifying this Court's review of the merits of the underlying claim."); *Commonwealth v. Eline*, 940 A.2d 421, 435 (Pa. Super. 2007) ("[A] claim of inadequate consideration of mitigating factors does not raise a substantial question for our review."); *Commonwealth v. Bullock*, 868 A.2d 516, 529 (Pa. Super. 2005) ("A Rule 2119(f) statement that simply contains incantations of statutory provisions and pronouncements of conclusions of law is inadequate.") (internal quotation marks omitted).

However, when read in conjunction with his statement of questions presented, *see Radecki*, *supra*, we conclude that Goddard raises a

substantial question for our review. ***See also Commonwealth v. Felix***, 539 A.2d 371, 377 (Pa. Super. 1988) (court may look to both Pa.R.A.P. 2119(f) statement and statement of questions presented to determine if substantial questions are raised). Specifically, a claim that a court imposed a sentence outside the guidelines while failing to consider mitigating circumstances has been found to raise a substantial question. ***See Commonwealth v. Swope***, 123 A.3d 333, 340 (Pa. 2015) (holding claim of excessiveness coupled with claim trial court failed to consider rehabilitative needs and mitigating factors presents a substantial question); ***Commonwealth v. Samuel***, 102 A.3d 1001, 1007 (Pa. Super. 2014) (same).

Our standard of review is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Blount***, 207 A.3d 925, 934-35 (Pa. Super. 2017) (quoting ***Commonwealth v. Zirkle***, 107 A.3d 127, 132 (Pa. Super. 2014)). Moreover, this Court's review of the discretionary aspects of a sentence is governed by 42 Pa.C.S.A. §§ 9781(c) and (d). ***Commonwealth v. Dodge***, 77 A.3d 1263, 1274 (Pa. Super. 2013). Section 9781(c) reads:

> (c) Determination on appeal.—The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:

(1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;

(2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or

(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.

42 Pa.C.S.A. § 9781(c).  Subsection 9781(d) requires that in reviewing the record, we consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d).  Additionally, "[w]here pre-sentence reports exist, we shall continue to presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.  A pre-sentence report constitutes the record and speaks for itself." *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988).

Here, Goddard claims that the trial court abused its discretion because the court only

gave lip service to [Goddard]'s completely clean prior criminal record while focusing instead on the seriousness of the incident and that one of [Goddard's] bullets ended up in April Coleman's home. The [c]ourt completely disregarded [Goddard's] statement during the presentence investigation that [he] did not know how the bullet went through the Coleman home. . . . Put simply, the [c]ourt did not believe that[, Goddard, an] adult man who had lawfully moved to the United States from Panama and educated himself and worked hard all his life[,] and who tried to give his son a better life than in New York City [*sic*], would form a belief that [his] son was in danger and [Goddard] might act out of a heat of passion.

Appellant's Brief, at 33. Goddard claims further that "[n]one of [Goddard]'s achievements were given weight during the sentencing." ***Id.*** at 35.

In arguing an abuse of discretion, Goddard essentially asks this Court to re-weigh the sentencing factors presented to the trial court. This we cannot do. ***See Commonwealth v. Griffin***, 804 A.2d 1, 9 (Pa. Super. 2002) (citing ***Commonwealth v. Williams***, 562 A.2d 1385, 1388 (Pa. Super. 1989) (en banc) (allegation sentencing court failed to consider or did not adequately consider various factors is request that this Court substitute its judgment for that of lower court in fashioning appellant's sentence, which does not raise substantial question)). Also, at sentencing, the court stated that it had the benefit of reading Goddard's pre-sentence report. ***See*** N.T. Sentencing, 6/13/19, at 31-33. Therefore, we assume that the court properly weighed Goddard's mitigating statutory factors. ***See Devers***, ***supra***. Finally, despite Goddard's claims to the contrary, the sentencing court **did** consider his stated mitigating factors. ***See*** N.T. Sentencing, 6/13/19, at 31-33. Consequently, Goddard has not shown that that his sentence is unreasonable;

thus, his discretionary aspect of sentencing claim fails. **See** 42 Pa.C.S.A. § 9781(c)(3). Therefore, the sentence imposed on Goddard was not an abuse of the court's discretion. ***See Blount, supra.***

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2020